# FEDERAL TRADE COMMISSION *v.* GRATZ ET AL., COPARTNERS DOING BUSINESS UNDER THE FIRM NAME AND STYLE OF WARREN, JONES & GRATZ, ET AL.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 492. Argued April 20, 21, 1920.—Decided June 7, 1920.

Under the Federal Trade Commission Act (Sept. 26, 1914, c. 311, 38 Stat. 717), an order of the commission requiring parties to desist from a course of business as unfair competition must correspond with the complaint which the commission is required to issue and serve as the basis for the proceedings; and where the complaint, liberally construed, is plainly insufficient to show unfair competition, the order is without foundation and, when challenged, will be annulled by the court. P. 427.

The commission's complaint alleged that some of the respondents were engaged in selling, in interstate commerce, directly to the trade or through their co-respondents, steel ties, manufactured by a certain company, made and used for binding bales of cotton, and jute bagging, manufactured by another company, used to wrap bales of cotton; that the other respondents, as their agents, sold and distributed such ties and bagging, in interstate commerce, principally to jobbers and dealers who resold the same to retailers, cotton-ginners and farmers; and that, with the purpose, intent and effect of discouraging and stifling competition, all of the respondents refused, and for more than a year had refused, to sell any such ties unless the prospective purchaser would also buy from them the bagging to be used with the number of ties proposed to be bought. *Held*, plainly insufficient to show an unfair method of competition. *Id.*
258 Fed. Rep. 314, affirmed.

THE case is stated in the opinion.

*Mr. Huston Thompson*, with whom *The Solicitor General* and *Mr. Claude R. Porter* were on the brief, for petitioner.

*Mr. Thomas F. Magner* for respondents.

MR. JUSTICE MCREYNOLDS delivered the opinion of the court.

By an Act approved September 26, 1914, c. 311, 38 Stat. 717, Congress made provision for the Federal Trade Commission and declared its powers.

Section 4 defines commerce as "commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation."

Section 5.—"That unfair methods of competition in commerce are hereby declared unlawful. The commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, and common carriers subject to the Acts to regulate commerce, from using unfair methods of competition in commerce. Whenever the commission shall have reason to believe that any such person, partnership, or corporation has been or is using any unfair method of competition in commerce, and if it shall appear to the commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect, and containing a notice of a hearing upon a day and at a place therein fixed at least thirty days after the service of said complaint. The person, partnership, or corporation so complained of shall have the right to appear at the place and time so fixed and show cause why an order should not be entered by the commission requiring such person, partnership, or corporation to cease and desist from the violation of the law so charged in said complaint. . . . If upon such hearing the commission shall be of the opinion that the method of competition in question is prohibited

by this Act, it shall make a report in writing in which it shall state its findings as to the facts, and shall issue and cause to be served on such person, partnership, or corporation an order requiring such person, partnership, or corporation to cease and desist from using such method of competition."

Section 5 further provides that the commission may apply to the designated Circuit Court of Appeals to enforce an order, "And shall certify and file with its application a transcript of the entire record in the proceeding, including all the testimony taken and the report and order of the commission. Upon such filing of the application and transcript the court shall cause notice thereof to be served upon such person, partnership, or corporation and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to make and enter upon the pleadings, testimony, and proceedings set forth in such transcript a decree affirming, modifying, or setting aside the order of the commission. The findings of the commission as to the facts, if supported by testimony, shall be conclusive. . . . The judgment and decree of the court shall be final, except that the same shall be subject to review by the Supreme Court upon certiorari as provided in section two hundred and forty of the Judicial Code. Any party required by such order of the commission to cease and desist from using such method of competition may obtain a review of such order in said circuit court of appeals by filing in the court a written petition praying that the order of the commission be set aside. A copy of such petition shall be forthwith served upon the commission, and thereupon the commission forthwith shall certify and file in the court a transcript of the record as hereinbefore provided. Upon the filing of the transcript the court shall have the same jurisdiction to affirm, set aside, or modify the order of the commission as in the case of an application by the commission for the

enforcement of its order, and the findings of the commission as to the facts, if supported by testimony, shall in like manner be conclusive."

Sections 6 and 7 empower the commission to require reports and compile information concerning corporations; to inquire concerning execution of decrees restraining violations of the anti-trust acts; to investigate alleged violations of such acts; to recommend readjustments of corporate business; to publish information and make reports to Congress; to classify corporations and make rules and regulations; to investigate trade conditions; to act, under orders of the court, as a master in chancery in certain designated circumstances, etc.

Undertaking to proceed under § 5, June 4, 1917, the commission issued a complaint containing two counts against respondents. The first related to unfair methods of competition, and the second charged violation of § 3 of the Clayton Act, approved October 15, 1914, c. 323, 38 Stat. 730. Respondents denied both charges. After taking much testimony the commission held there was no evidence to support the second count; but it ruled that respondents had practiced unfair competition and ordered that they, "their officers and agents, cease and desist from requiring purchasers of cotton ties to also buy or agree to buy, a proportionate amount of American Manufacturing Company's bagging and further that the respondents cease and desist from refusing to sell cotton ties unless the purchasers buy or agree to buy from them corresponding amounts of American Manufacturing Company's bagging, or any amount of cotton bagging of any kind."

Upon respondents' petition the Circuit Court of Appeals, Second Circuit, annulled the commission's order. 258 Fed. Rep. 314. It said, "We think there is no evidence to support any general practice of the respondents to refuse to sell ties unless the purchaser bought at the same time the necessary amount of the American Manufac-

turing Company's bagging, and that the commission has no jurisdiction to determine the merits of specific individual grievances."

The challenged order is based solely upon the first count of the complaint which follows:

"Federal Trade Commission

"*vs.*

"Anderson Gratz and Benjamin Gratz, co-partners, doing
    business under the firm name and style of Warren,
    Jones & Gratz; P. P. Williams, W. H. Fitzhugh and
    Alex. Fitzhugh, co-partners, doing business under the
    firm name and style of P. P. Williams & Co., and
    Charles O. Elmer.

"The Federal Trade Commission having reason to believe, from a preliminary investigation made by it that Anderson Gratz and Benjamin Gratz, co-partners, doing business under the firm name and style of Warren, Jones & Gratz; P. P. Williams, W. H. Fitzhugh and Alex. Fitzhugh, co-partners, doing business under the firm name and style of P. P. Williams & Co., and Charles O. Elmer, all of whom are hereinafter referred to as respondents, have been, and are, using unfair methods of competition in interstate commerce in violation of the provisions of section 5 of the act of Congress approved September 26, 1914, entitled 'An act to create a Federal Trade Commission, to define its powers and duties, and for other purposes,' and it appearing that a proceeding by it in respect thereof would be to the interest of the public, issues this complaint, stating its charges in that respect, on information and belief, as follows:

"I.

"Paragraph one: That the respondents, Anderson Gratz and Benjamin Gratz, are co-partners, doing business under the firm name and style of Warren, Jones & Gratz, having their principal office and place of business

in the city of St. Louis and State of Missouri, and are engaged in the business of selling, in interstate commerce, either directly to the trade, or through the respondents hereinafter named, steel ties made and used for binding bales of cotton, and which steel ties are manufactured by the Carnegie Steel Company of Pittsburg, Pennsylvania, and also selling, in the same manner, jute bagging, used to wrap bales of cotton, and which jute bagging is manufactured by the American Manufacturing Company, of St. Louis, Missouri.

"Paragraph two: That the respondents, P. P. Williams, W. H. Fitzhugh and Alex. Fitzhugh, are co-partners, doing business under the firm name and style of P. P. Williams & Co., having their principal office and place of business in the city of Vicksburg and State of Mississippi, and the said last-named respondents and the said respondent Charles O. Elmer, who is located and doing business at the city of New Orleans and State of Louisiana, are the selling and distributing agents of the said firm of Warren, Jones & Gratz, and sell and distribute the ties and bagging, manufactured as aforesaid, in interstate commerce, principally to jobbers and dealers, who resell the same to retailers, cotton ginners, and farmers.

"Paragraph three: That with the purpose, intent, and effect of discouraging and stifling competition in interstate commerce in the sale of such bagging, all of the respondents do now refuse, and for more than a year last past have refused to sell any of such ties unless the prospective purchaser thereof would also buy from them bagging to be used with the number of ties proposed to be bought; that is to say, for each six of such ties proposed to be bought from the respondents the prospective purchaser is required to buy six yards of such bagging."

It is unnecessary now to discuss conflicting views concerning validity and meaning of the act creating the commission and effect of the evidence presented. The

judgment below must be affirmed since, in our opinion, the first count of the complaint is wholly insufficient to charge respondents with practicing "unfair methods of competition in commerce" within the fair intendment of those words. We go no further and confine this opinion to the point specified.

When proceeding under § 5, it is essential, *first*, that, having reason to believe a person, partnership or corporation has used an unfair method of competition in commerce, the commission shall conclude a proceeding "in respect thereof would be to the interest of the public;" *next*, that it formulate and serve a complaint stating the charges "in that respect" and give opportunity to the accused to show why an order should not issue directing him to "cease and desist from the violation of the law so charged in said complaint." If after a hearing the commission shall deem "the method of competition in question is prohibited by this Act," it shall issue an order requiring the accused "to cease and desist from using such method of competition."

If, when liberally construed, the complaint is plainly insufficient to show unfair competition within the proper meaning of these words there is no foundation for an order to desist—the thing which may be prohibited is the method of competition specified in the complaint. Such an order should follow the complaint; otherwise it is improvident, and, when challenged, will be annulled by the court.

The words "unfair method of competition" are not defined by the statute and their exact meaning is in dispute. It is for the courts, not the commission, ultimately to determine as matter of law what they include. They are clearly inapplicable to practices never heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create monopoly. The act was

certainly not intended to fetter free and fair competition as commonly understood and practiced by honorable opponents in trade.

Count one alleges, in effect, that Warren, Jones & Gratz are engaged in selling, either directly to the trade or through their co-respondents, cotton ties produced by the Carnegie Steel Company and also jute bagging manufactured by the American Manufacturing Company. That P. P. Williams & Company of Vicksburg, and Charles O. Elmer of New Orleans, are the selling and distributing agents of Warren, Jones & Gratz, and as such sell and distribute their ties and bagging to jobbers and dealers who resell them to retailers, ginners and farmers. That with the purpose and effect of discouraging and stifling competition in the sale of such bagging all the respondents for more than a year have refused to sell any of such ties unless the purchaser would buy from them a corresponding amount of bagging—six yards with as many ties.

The complaint contains no intimation that Warren, Jones & Gratz did not properly obtain their ties and bagging as merchants usually do; the amount controlled by them is not stated; nor is it alleged that they held a monopoly of either ties or bagging or had ability, purpose or intent to acquire one. So far as appears, acting independently, they undertook to sell their lawfully acquired property in the ordinary course, without deception, misrepresentation, or oppression, and at fair prices, to purchasers willing to take it upon terms openly announced.

Nothing is alleged which would justify the conclusion that the public suffered injury or that competitors had reasonable ground for complaint. All question of monopoly or combination being out of the way, a private merchant, acting with entire good faith, may properly refuse to sell except in conjunction, such closely associated articles as ties and bagging. If real competition is to continue, the right of the individual to exercise reasonable discretion

in respect of his own business methods must be preserved. *United States* v. *Colgate & Co.*, 250 U. S. 300; *United States* v. *A. Schrader's Son, Inc.*, 252 U. S. 85.

The first count of the complaint fails to show any unfair method of competition practiced by respondents and the order based thereon was improvident.

The judgment of the court below is

*Affirmed.*

MR. JUSTICE PITNEY concurs in the result.

MR. JUSTICE BRANDEIS dissenting, with whom MR. JUSTICE CLARKE concurs.

*First.* The court disposes of the case on a question of pleading. This, under the circumstances, is contrary to established practice. The circumstances are these:

The pleading held defective is not one in this suit. It is the pleading by which was originated the proceeding before the Federal Trade Commission, an administrative tribunal, whose order this suit was brought to set aside. No suggestion was made in the proceeding before the Commission that the complaint was defective. No such objection was raised in this suit in the court below. It was not made here by counsel. The objection is taken now for the first time and by the court.

This suit, begun in the Circuit Court of Appeals for the Second Circuit, was brought to set aside an order of the Federal Trade Commission. Before the latter the matter involved was thoroughly tried on the merits. There was a complaint and answers. Thirty-five witnesses were examined and cross-examined. A report of proposed findings as to facts was submitted by the Examiner and exceptions were filed thereto. Then, the case was heard before the Commission, which made a finding of facts, stated its conclusions as to the law, and ultimately issued the order in question. The proceedings occupied more

than sixteen months. The report of them fills four hundred pages of the printed record. In my opinion it is our duty to determine whether the facts found by the Commission are sufficient in law to support the order; and, also, if it is questioned, whether the evidence was sufficient to support the findings of fact.

*Second.* If the sufficiency of the complaint is held to be open for consideration here, we should, in my opinion, hold it to be sufficient. The complaint was filed under § 5 of the Federal Trade Commission Act which declares unlawful "unfair methods of competition in commerce "; empowers the Commission to prevent their use; and directs it to issue and serve "a complaint stating its charges in that respect" whenever it has reason to believe that a concern "has been or is using" such methods. The function of the complaint is solely to advise the respondent of the charges made so that he may have due notice and full opportunity for a hearing thereon. It does not purport to set out the elements of a crime like an indictment or information, nor the elements of a cause of action like a declaration at law or a bill in equity. All that is requisite in a complaint before the Commission is that there be a plain statement of the thing claimed to be wrong so that the respondent may be put upon his defence. The practice of the Federal Trade Commission in this respect, as in many others, is modelled on that which has been pursued by the Interstate Commerce Commission for a generation and has been sanctioned by this as well as the lower federal courts. *United States Leather Co.* v. *Southern Ry. Co.,* 21 I. C. C. 323, 324; *Clinton Sugar Refining Co.* v. *C. & N. W. Ry. Co.,* 28 I. C. C. 364, 367; *Stuarts Draft Milling Co.* v. *Southern Ry. Co.,* 31 I. C. C. 623, 624; *New York Central, etc., R. R. Co.* v. *Interstate Commerce Commission,* 168 Fed. Rep. 131, 138–139; *Dickerson* v. *Louisville & Nashville R. R. Co.,* 187 Fed. Rep. 874, 878; *Texas & Pacific Ry. Co.* v. *Interstate Commerce Commission,* 162

U. S. 197, 215; *Cincinnati, Hamilton & Dayton Ry. Co.* v. *Interstate Commerce Commission*, 206 U. S. 142, 149.

The complaint here under consideration stated clearly that an unfair method of competition had been used by respondents, and specified what it was, namely, refusing to sell cotton ties unless the customer would purchase with each six ties also six yards of bagging. The complaint did not set out the circumstances which rendered this tying of bagging to ties an unfair practice. But this was not necessary. The complaint was similar in form to those filed with the Interstate Commerce Commission on complaints to enforce the prohibition of "unjust and unreasonable charges" or of "undue or unreasonable preference or advantage" which the Act to Regulate Commerce imposes. It is unnecessary to set forth why the rate specified was unjust or why the preference specified is undue or unreasonable, because these are matters not of law but of fact to be established by the evidence. *Pennsylvania Company* v. *United States*, 236 U. S. 351, 361. So far as appears neither this nor any other court has ever held that an order entered by the Interstate Commerce Commission may be set aside as void, because the complaint by which the proceeding was initiated, failed to set forth the reasons why the rate or the practice complained of was unjust or unreasonable; and I cannot see why a different rule should be applied to orders of the Federal Trade Commission issued under § 5.[1]

---

[1] See Report Senate Committee on Interstate Commerce, June 13, 1914, 63d Cong., 2d sess., No. 597, p. 13: "It is believed that the term 'unfair competition' has a legal significance which can be enforced by the commission and the courts, and that it is no more difficult to determine what is unfair competition than it is to determine what is a reasonable rate or what is an unjust discrimination. The committee was of the opinion that it would be better to put in a general provision condemning unfair competition than to attempt to define the numerous unfair practices, such as local price cutting, interlocking directorates, and holding companies intended to restrain substantial competition."

In considering whether the complaint is sufficient, it is necessary to bear in mind the nature of the proceeding under review. The proceeding is not punitive. The complaint is not made with a view to subjecting the respondents to any form of punishment. It is not remedial. The complaint is not filed with a view to affording compensation for any injury alleged to have resulted from the matter charged, nor with a view to protecting individuals from any such injury in the future. The proceeding is strictly a preventive measure taken in the interest of the general public. And what it is brought to prevent is not the commission of *acts* of unfair competition, but the pursuit of unfair *methods*. Furthermore, the order is not self-executory. Standing alone it is only informative and advisory. The Commission cannot enforce it. If not acquiesced in by the respondents the Commission may apply to the Circuit Court of Appeals to enforce it. But the Commission need not take such action; and it did not do so in respect to the order here in question. Respondents may, if they see fit, become the actors and ask to have the order set aside. That is what was done in the case at bar.

The proceeding is thus a novelty. It is a new device in administrative machinery, introduced by Congress in the year 1914, in the hope thereby of remedying conditions in business which a great majority of the American people regarded as menacing the general welfare, and which for more than a generation they had vainly attempted to remedy by the ordinary processes of law. It was believed that widespread and growing concentration in industry and commerce restrained trade and that monopolies were acquiring increasing control of business. Legislation designed to arrest the movement and to secure disintegration of existing combinations had been enacted by some of the States as early as 1889. In 1890 Congress passed the Sherman Law. It was followed by much

legislation in the States [1] and many official investigations. Between 1906 and 1913 reports were made by the Federal Bureau of Corporations of its investigations into the petroleum industry, the tobacco industry, the steel industry and the farm implement industry. A special committee of Congress investigated the affairs of the United States Steel Corporation. And in 1911 this court rendered its decision in *Standard Oil Co.* v. *United States,* 221 U. S. 1, and in *United States* v. *American Tobacco Co.,* 221 U. S. 106. The conviction became general in America, that the legislation of the past had been largely ineffective. There was general agreement that further legislation was desirable. But there was a clear division of opinion as to what its character should be. Many believed that concentration (called by its opponents monopoly) was inevitable and desirable; and these desired that concentration should be recognized by law and be regulated. Others believed that concentration was a source of evil; that existing combinations could be disintegrated, if only the judicial machinery were perfected; and that further concentration could be averted by providing additional remedies, and particularly through regulating competition. The latter view prevailed in the Sixty-third Congress.[2]

---

[1] See Laws on Trusts and Monopolies. Compiled under direction of the Clerk of the House Committee on the Judiciary, 63d Cong., by Nathan B. Williams. Revised January 10, 1914; also Trust Laws and Unfair Competition (Federal) Bureau of Corporations, March 15, 1915.

[2] See Report of Senate Committee on Interstate Commerce, June 13, 1914, 63d Cong., 2d sess., No. 597, p. 10, reporting the bill:

"Some would found such a Commission upon the theory that monopolistic industry is the ultimate result of economic evolution and that it should be so recognized and declared to be vested with a public interest and as such regulated by a commission. This contemplates even the regulation of prices. Others hold that private monopoly is intolerable, unscientific, and abnormal, but recognize that a commission is a necessary adjunct to the preservation of competition and to the practical enforcement of the law. . . . .

The Clayton Act (October 15, 1914, c. 323, 38 Stat. 730) was framed largely with a view to making more effective the remedies given by the Sherman Law. The Federal Trade Commission Act (September 26, 1914, c. 311, 38 Stat. 717) created an administrative tribunal, largely with a view to regulating competition.

Many of the duties imposed upon the Trade Commission had been theretofore performed by the Bureau of Corporations. That which was in essence new legislation was the power conferred by § 5. The belief was widespread that the great trusts had acquired their power, in the main, through destroying or overreaching their weaker rivals by resort to unfair practices.[1] As Standard Oil rebates led to the creation of the Interstate Commerce Commission,[2] other unfair methods of competition, which the investigations of the trusts had laid bare, led to the creation of the Federal Trade Commission. It was hoped that as the former had substantially eliminated rebates—the latter might put an end to all other unfair trade practices;— and that it might prove possible thereby to preserve the competitive system. It was a new experiment on old lines; and the machinery employed was substantially, similar.

In undertaking to regulate competition through the Trade Commission Congress (besides resorting to administrative as distinguished from judicial machinery) departed in two important respects from the methods and measures theretofore applied in dealing with trusts and restraints of trade:

(1) Instead of attempting to inflict punishment for having done prohibited acts, instead of enjoining the

"The commission which is proposed by your committee in the bill submitted is founded upon the latter purpose and idea."

[1] See "Unfair Competition," by William S. Stevens, Political Science Quarterly (1914), p. 283; "The Morals of Monopoly and Competition" (1916), by H. B. Reed.

[2] See Railway Problems, by William Z. Ripley (1907), p. X.

continuance of prohibited combinations and compelling disintegration of those formed in violation of law, the act undertook to preserve competition through supervisory action of the Commission. The potency of accomplished facts had already been demonstrated. The task of the Commission was to protect competitive business from *further* inroads by monopoly. It was to be ever vigilant. If it discovered that any business concern had used any practice which would be likely to result in public injury—because in its nature it would tend to aid or develop into a restraint of trade—the Commission was directed to intervene, before any act should be done or condition arise violative of the Anti-Trust Act. And it should do this by filing a complaint with a view to a thorough investigation; and, if need be, the issue of an order. Its action was to be prophylactic. Its purpose in respect to restraints of trade was prevention of diseased business conditions, not cure.[1]

---

[1] Senator Cummins, chairman of the committee which reported the bill, said (Cong. Rec., vol. 51, p. 11455):

"Unfair competition must usually proceed to great lengths and be destructive of competition before it can be seized and denounced by the anti-trust law. In other cases it must be associated with, coupled with, other vicious and unlawful practices in order to bring the person or the corporation guilty of the practice within the scope of the anti-trust law. The purpose of this bill in this section and in other sections which I hope will be added to it, is to seize the offender before his ravages have gone to the length necessary in order to bring him within the law that we already have.

"We knew little of these things in 1890. The commerce of the United States has largely developed in the last twenty-five years. The modern methods of carrying on business have been discovered and put into operation in the last quarter of a century; and as we have gone on under the anti-trust law and under the decisions of the court in their effort to enforce that law, we have observed certain forms of industrial activity which ought to be prohibited whether in and of themselves they restrain trade or commerce or not. We have discovered that their tendency is evil; we have discovered that the end which is inevitably

(2) Instead of undertaking to define what practices should be deemed unfair, as had been done in earlier legis-· lation, the act left the determination to the Commission.[1] Experience with existing laws had taught that definition, being necessarily rigid, would prove embarrassing and, if rigorously applied, might involve great hardship. Methods of competition which would be unfair in one industry, under certain circumstances, might, when adopted in another industry, or even in the same industry under different circumstances, be entirely unobjectionable.[2]

---

reached through these methods is an end which is destructive of fair commerce between the states. It is these considerations which, in my judgment, have made it wise, if not necessary to supplement the anti-trust law by additional legislation, not in antagonism to the anti-trust law, but in harmony with the anti-trust law, to more effectively put into the industrial life of America the principle of the anti-trust law, which is fair, reasonable competition, independence to the individual, and disassociation among the corporations. . . ."

[1] See Report Senate Committee on Interstate Commerce, June 13, 1914, 63d Cong., 2d sess., No. 597, p. 13: "The committee gave careful consideration to the question as to whether it would attempt to define the many and variable unfair practices which prevail in commerce and to forbid their continuance or whether it would, by a general declaration condemning unfair practices, leave it to the commission to determine what practices were unfair. It concluded that the latter course would be the better. . . ." See also "Unfair Competition," by W. H. S. Stevens (University of Chicago Press, 1916), pp. 1, 2. For laws prohibiting specific acts of unfair competition, see "Trust Laws and Unfair Competition," (Federal) Bureau of Corporations (March 15, 1915), pp. 184, 199.

[2] Report of (Federal) Bureau of Corporations on the International Harvester Co., March 3, 1913, p. 30: "In discussing the competitive methods of the company it should be recognized that some practices which might be regarded with indifference if there were a number of competitors of substantially equal size and power may become objectionable when one competitor far outranks not only its nearest rival, but practically all rivals combined, as is true of the International Harvester Co., so far as several of its most important lines are concerned."

The Australian Industries Preservation Act, 1908–1910, expressly ·

Furthermore, an enumeration, however comprehensive, of existing methods of unfair competition must necessarily soon prove incomplete, as with new conditions constantly arising novel unfair methods would be devised and developed. In leaving to the Commission the determination of the question whether the method of competition pursued in a particular case was unfair, Congress followed the precedent which it had set a quarter of a century earlier, when by the Act to Regulate Commerce it conferred upon the Interstate Commerce Commission power to determine whether a preference or advantage given to a shipper or locality fell within the prohibition of an undue or unreasonable preference or advantage.[1] See *Pennsylvania Co.* v. *United States, supra,* p. 361; *Texas & Pacific Ry. Co.* v. *Interstate Commerce Commission,* 162 U. S. 197, 219, 220. Recognizing that the question whether a method of competitive practice was unfair would ordinarily depend upon special facts, Congress imposed upon the Commission the duty of finding the facts; and it declared that findings of fact so made (if duly supported by evidence) were to be taken as final. The question whether the method of competition pursued could, on those facts, reasonably be held by the Commission to constitute an unfair method of competition, being a question of law, was necessarily left open to review by the court. Compare *Interstate Commerce Commission* v. *Diffenbaugh,* 222 U. S. 42; *Interstate Commerce Commission* v. *Baltimore & Ohio R. R. Co.,* 145 U. S. 263.

*Third.* Such a question of law is presented to us for decision; and it is this: Can the refusal by a manufacturer to sell his product to a jobber or retailer except upon condition that the purchaser will buy from him also his

---

declares that "unfair competition means competition which is unfair in the circumstances." "Trust Laws and Unfair Competition," (Federal) Bureau of Corporations (March 15, 1915), pp. 552, 747.

[1] See note 1, *ante,* 431.

trade requirements in another article or articles, reasonably be found by the Commission to be an unfair method of competition under the circumstances set forth in the findings of fact?  If we were called upon to consider the sufficiency of the complaint, and that merely, the question for our decision would be, whether the particular practice could, under any circumstances, reasonably be deemed an unfair method of competition.  But as this suit to set aside the order of the Commission brings before us its findings of fact, we must determine whether these are sufficient to support their conclusion of law that the practice constituted "under the circumstances therein set forth, unfair methods of competition in interstate commerce, against other manufacturers, dealers and distributors . . . in the material known as sugar bag cloth, and against manufacturers, dealers and distributors of the bagging known as rewoven bagging and second hand bagging, in violation of" the statute.

It is obvious that the imposition of such a condition is not necessarily and universally an unfair method; but that it may be such under some circumstances seems equally clear.  Under the usual conditions of competitive trade the practice might be wholly unobjectionable. But the history of combinations has shown that what one may do with impunity, may have intolerable results when done by several in coöperation.  Similarly, what approximately equal individual traders may do in honorable rivalry, may result in grave injustice and public injury, if done by a great corporation in a particular field of business which it is able to dominate.  In other words, a method of competition fair among equals may be very unfair if applied where there is inequality of resources.[1] Without providing for those cases where the method of competition here involved would be unobjectionable,

---

[1] See "The Morals of Monopoly and Competition," by H. B. Reed (1916), pp. 120-122.

Massachusetts legislated against the practice, as early as 1901, by a statute (c. 478) of general application.    Its highest court, in applying the law which it held to be constitutional, described the prohibited method as "unfair competition."  *Commonwealth* v. *Strauss*, 188 Massachusetts, 229; 191 Massachusetts, 545.    Compare *People* v. *Duke*, 44 N. Y. S. 336.    The (Federal) Bureau of Corporations held the practice, which it described as "full-line forcing", to be highly reprehensible.[1]  Congress, by § 3 of the Clayton Act, specifically prohibited the practice in a limited field under certain circumstances.    An injunction against the practice has been included in several decrees in favor of the Government entered in cases under the Sherman Law.[2]    In the decree by which the American Tobacco Company was disintegrated pursuant to the mandate of this court, each of the fourteen companies was enjoined from "refusing to sell to any jobber any brand of any tobacco product manufactured by it, except upon condition that such jobber shall purchase from the vendor some other brand or product also manufactured and sold by it.  . . . "  *United States* v. *American Tobacco Co.*, 191 Fed. Rep. 371, 429.    The practice here in question is merely one form of the so-called "tying clauses" or "conditional requirements" which have been declared in a discerning study of the whole subject to be "perhaps the most interesting of any of the methods of unfair competition." [3]

The following facts found by the Commission, and which the Circuit Court of Appeals held were supported by sufficient evidence, show that the conditions in the

---

[1] Report of the (Federal) Bureau of Corporations on the International Harvester Company (March 3, 1913), p. 308.

[2] See "Unfair Methods of Competition and their Prevention," by W. H. S. Stevens, Annals, American Academy of Political and Social Science (1916), pp. 42, 43.  "Trust Laws and Unfair Competition" (Federal) Bureau of Corporations (March 15, 1915), pp. 484–486, 493.

[3] "Unfair Competition," by W. H. S. Stevens (1916), p. 54.

cotton tie and bagging trade were in 1918 such that the Federal Trade Commission could reasonably find that the tying clause here in question was an unfair method of competition: Cotton, America's chief staple, is marketed in bales. To bale cotton steel ties and jute bagging are essential. The Carnegie Steel Company, a subsidiary of the United States Steel Corporation, manufactures so large a proportion of all such steel ties that it dominates the cotton tie situation in the United States and is able to fix and control the price of such ties throughout the country. The American Manufacturing Company manufactures about 45 per cent. of all bagging used for cotton baling; one other company about 20 per cent.; and the remaining 35 per cent. is made up of second-hand bagging and a material called sugar-bag cloth. Warren, Jones & Gratz, of St. Louis, are the Carnegie Company's sole agents for selling and distributing steel ties. They are also the American Manufacturing Company's sole agents for selling and distributing jute bagging in the cotton-growing section west of the Mississippi. By virtue of their selling agency for the Carnegie Company, Warren, Jones & Gratz held a dominating and controlling position in the sale and distribution of cotton ties in the entire cotton-growing section of the country, and thereby were in a position to force would-be purchasers of ties to also buy from them bagging manufactured by the American Manufacturing Company. A great many merchants, jobbers and dealers in bagging and ties throughout the cotton-growing States were many times unable to procure ties from any other firm than Warren, Jones & Gratz. In many instances Warren, Jones & Gratz refused to sell ties unless the purchaser would also buy from them a corresponding amount of bagging, and such purchasers were oftentimes compelled to buy from them bagging manufactured by the American Manufacturing Company in order to procure a sufficient supply of steel ties.

These are conditions closely resembling those under which "full-line forcing," "exclusive-dealing requirements" or "shutting off materials, supplies or machines from competitors"—well known methods of competition,. have been held to be unfair, when practiced by concerns holding a preponderant position in the trade.[1]

*Fourth.* The Circuit Court of Appeals set aside the order of the Commission solely on the ground that it was without authority to determine the merits of specific individual grievances, and that the evidence did not support its finding that Warren, Jones & Gratz had "adopted and practiced the policy of refusing to sell steel ties to those merchants and dealers who wished to buy them from them unless such merchants and dealers would also buy from them a corresponding amount of jute bagging."

The reason assigned by the Circuit Court of Appeals for so holding was that the evidence failed to show that the practice complained of (although acted on in individual cases by respondents) had become their "general practice." But the power of the Trade Commission to prohibit an unfair method of competition found to have been used is not limited to cases where the practice had become general. What § 5 declares unlawful is not unfair competition. That had been unlawful before. What that section made unlawful were "unfair *methods* of competition" ; that is, the method or means by which an unfair end might be accomplished. The Commission was directed to act, if it had reason to believe that an "unfair method of competition in commerce" has been or is being used. The purpose of Congress was to prevent any unfair method which may have been used by any concern in competition from becoming its general practice. It was only by stopping its use before it became a general prac-

---

[1] See "Trust Laws and Unfair Competition," (Federal) Bureau of Corporations (March 15, 1915), pp. 319–323, 328.

tice, that the apprehended effect of an unfair method in suppressing competition by destroying rivals could be averted. As the Circuit Court of Appeals found that the evidence was sufficient to support the facts set forth above, and since on those facts the Commission could reasonably hold that the method of competition in question was unfair under the circumstances, it had power under the act to issue the order complained of.

In my opinion the judgment of the Circuit Court of Appeals should be reversed.