### R. F. KEPPEL & BRO., Inc., v. FEDERAL TRADE COMMISSION.

#### No. 4835.

Circuit Court of Appeals, Third Circuit.

Jan. 25, 1933.

WOOLLEY, J., dissenting.

Mohun & Elliott, of Washington, D. C. (George E. Elliott, of Washington, D. C., and John A. Coyle, of Lancaster, Pa., of counsel), for appellant.

Robert E. Healy, Chief Counsel, Federal Trade Commission, Martin A. Morrison, Asst. Chief Counsel, Federal Trade Commission, Henry C. Lank, and G. Edwin Rowland, all of Washington, D. C., for appellee.

Before WOOLLEY, DAVIS, and THOMPSON, Circuit Judges.

THOMPSON, Circuit Judge.

This is a petition to review an order of the Federal Trade Commission requiring the petitioner to desist from certain of its trade practices. The petitioner manufactures, sells, and distributes in interstate commerce certain packages or assortments of candy. Each assortment is accompanied by a display card designed to be used by the retailer. One assortment known as "Chocolate Penny Men 120's" is composed of 120 chocolate covered candies, identical in appearance, four of which conceal pennies placed there by the petitioner at the time it manufactures and packs the assortment. The purchaser pays one cent for the individual pieces of candy. Four of the 120 purchasers regain their money by obtaining the pieces which contain the pennies. Another assortment bears the name "1, 2, 3 Big Chief 60's," and consists of peanut bars wrapped in paper. Inclosed in the wrapper is a ticket showing the retail price to be paid by the purchaser. This may be one, two, or three cents. It cannot be known, until the candy is unwrapped, what price the purchaser must pay for the particular piece. The third assortment, "School Days 200's," consists of 200 chocolate covered creams of a uniform size and shape, which retail at one cent each. Of these the centers of eight are pink, four are chocolate, and the remainder are white. Packed with the creams are eight pieces of chocolate candy representing a boy or girl, and four double pieces representing twins. The package contains, in addition, a "school companion." For a cream with a pink center, the purchaser receives the chocolate boy or girl; for a chocolate center, the twins; and for the last piece in the box, the "school companion." This is a fairly complete outline of the three sales plans in use by the petitioner.

The Federal Trade Commission filed a complaint in which it charged the petitioner with selling and distributing its candy by means of a sales plan or method which constitutes a lottery. Testimony was taken, and the Commission concluded that the sales plans which we have described are, in effect, games of chance, that they are against public policy, and that they constitute unfair competition in commerce. The Commission ordered the petitioner to cease and desist from the use of such practices.

Congress has exclusive control over the regulation of commerce among the states. The manner in which it exercises this constitutional power is not limited. It may regulate commerce by means designed to promote the public welfare, and in matters which are ordinarily within the police powers of the states. Lottery Case, 188 U. S. 321, 23 S. Ct. 321, 47 L. Ed. 492; Hoke v. United States, 227 U. S. 308, 33 S. Ct. 281, 57 L. Ed. 523, 43 L. R. A. (N. S.) 906, Ann. Cas. 1913E, 905; Caminetti v. United States, 242 U. S. 470, 37 S. Ct. 192, 61 L. Ed. 442, L. R. A. 1917F, 502, Ann. Cas. 1917B, 1168. Congress therefore had power, had it seen fit, to prohibit business methods such as are practiced by the petitioner. The contention of the respondent is that Congress has done so in section 5 of the Federal Trade Commission Act (15 USCA § 45), which provides:

"Unfair methods of competition in commerce are declared unlawful.

"*Power to prohibit.* The commission is empowered and directed to prevent persons, partnerships, or corporations, except banks, and common carriers subject to the Acts to regulate commerce, from using unfair methods of competition in commerce."

The act contains no definition of the words "unfair methods of competition in commerce," and their meaning must therefore be arrived at through a reasonable construction of the language used.

In a recent case in the Second Circuit [Northam Warren Corporation v. Federal Trade Commission, 59 F.(2d) 196, 198], complaint was made to the Federal Trade Commission by a trade competitor that the respondent was using testimonials for advertising purposes for which it had paid, and that that fact was not disclosed to its cus-

tomers. The Commission, holding that this was an unfair method of competition in commerce, issued a "cease and desist" order, from which the respondent appealed. Although the acts of the respondent may have been unethical and deceptive, in that the purchasing public was not informed that the judgment of those giving the testimonials may have been influenced by a money consideration, we are in accord with the reasoning of the court in reversing the order of the Federal Trade Commission. We quote from Judge Manton's opinion: "The Federal Trade Commission Act (15 USCA §§ 41–51) does not purport to establish a decalogue of good business manners or morals. Its purpose is to strike down at their inception practices which are unfair and which, if permitted to run their full course, would result in the creation of a monopoly and an undue restraint of trade. Even if a practice may be regarded as unethical, it would still be beyond the purview of the act if it lacks the public interest necessary to support the Commission's jurisdiction. Federal Trade Comm. v. Klesner, 280 U. S. 19, 50 S. Ct. 1, 74 L. Ed. 138, 68 A. L. R. 838. The Commission does not suggest that these testimonials tend to create a monopoly; they do not have a tendency to create an undue restraint of trade. The strongest argument the respondent makes is that failure to state the price paid for the testimonial amounts to deception and misrepresentation concerning the petitioner's product and in that way the petitioner is able to deprive honest manufacturers of a market. Federal Trade Comm. v. Winsted Hosiery Co., 258 U. S. 483, 42 S. Ct. 384, 66 L. Ed. 729. But where unlawful restraint of trade has been ordered to be discontinued it has always appeared that there was some dishonesty in labeling or marketing the goods. Federal Trade Comm. v. Winsted Hosiery Co., supra; Guarantee Veterinary Co. v. Federal Trade Comm., 285 F. 853 (C. C. A. 2); Royal Baking Powder Co. v. Federal Trade Comm., 281 F. 744 (C. C. A. 2); Procter & Gamble [Co.] v. Federal Trade Comm., 11 F.(2d) 47 (C. C. A. 6). In order that the Commission proceed in the public interest, the courts have insisted not only upon a showing that the practice is unfair and disapproved, but also that the public are misled thereby. Federal Trade Comm. v. Klesner, supra."

Practices which tend to hinder competition or create monopoly are against public policy just as practices which are characterized by deception, bad faith, fraud, or oppression are against good morals; but not all practices which are opposed to good morals or public policy amount to unfair methods of competition within the meaning of the Federal Trade Commission Act (45 USCA § 41 et seq.). Federal Trade Comm. v. Gratz, 253 U. S. 421, 40 S. Ct. 572, 64 L. Ed. 993; Federal Trade Comm. v. Raladam Co., 283 U. S. 643, 51 S. Ct. 587, 75 L. Ed. 1324, 79 A. L. R. 1191.

The petitioner did nothing against public policy, within the restricted sense of the term, because its acts did not, of themselves, tend to hinder competition nor create monopoly. Whatever they did, their competitors could do. Other candy manufacturers were free to use the same sales methods as those of the petitioner, and to obtain their share of the penny candy trade on an equal footing with the petitioner. The testimony shows that a decided majority of candy manufacturers did in fact use similar methods. There is nothing in the petitioner's practices tending to hinder competition or create monopoly.

The answer to the contention that the petitioner's practices constitute a breach of good morals, and, in that respect, unfair methods of competition, is that there is nothing in the case to show deception, fraud, or bad faith affecting its competitors or the ultimate consumer. Display cards sent by the petitioner to accompany the merchandise contain a complete, fair, and accurate description of the sales plans. The consumer receives a piece of candy for his cent, and, although he knows that the quantity is relatively less than if no prize were given, he is satisfied to deprive himself of the difference in bulk in exchange for his opportunity to obtain a prize.

We conclude that, upon a reasonable construction of the Federal Trade Commission Act, the Commission was without jurisdiction to make the "cease and desist" order brought here for review.

The order of the Commission is reversed.

WOOLLEY, Circuit Judge (dissenting).

I am constrained to dissent from the judgment of the court because of what I conceive to be a false strain that has run through the case from the beginning.

In little candy shops close to public schools, whose customers are small children and whose sales are of candy in small quantities at low prices, there has grown up a trade in "Break and Take" packages, described in the court's opinion. In all of these packages there is a single piece of candy; in a small number there is in addition money, a prize, or ticket giving a right

to a prize or to a price advantage. Thus the child, not knowing the contents of a package, buys with its penny two things, candy and a chance of getting something else. Packages containing prizes and those not containing prizes are so arranged in number that the child loses in nearly every purchase. To be definite, in one plan it wins on an average of one time out of thirty. This business, based on the instinct to gamble—as natural in children as in adults—has grown amazingly, and with undesirable results, personal and commercial.

In proceedings before the Federal Trade Commission, that tribunal issued an order against R. F. Keppel & Bro., Inc. to cease and desist from the practice on several findings of which one was that it constituted an unfair method of competition in commerce; another that it amounted to a lottery and, accordingly, was against the public policy of the United States and of many states.

Unfortunately the Commission at the hearing and in its findings stressed gambling as against good morals and public policy and, again unfortunately, the argument in this court on the candymaker's petition for review, following the overemphasis of the Commission, was directed to that phase of the matter as though it were an issue in the case —and the main issue. Still unfortunately, as I view it, the action of the Commission and the trend of the argument in that regard entered into and, in a different way, influenced the decision of the court when, as I look at the case, the decision has nothing to do with morals, business ethics, or public policy, but turns solely on questions, under the statute, of the Commission's jurisdiction in a matter of "public interest" and on the presence of evidence to support the Commission's finding of "unfair competition."

In order briefly to state my views I shall meet the four propositions presented by the petitioner as it has framed them:

"D. The Federal Trade Commission has no jurisdiction to enforce the Anti-Lottery Statutes of the United States and of the several states."

That is right.

"C. The petitioner's candy assortments were not articles of interstate commerce at the time of the employment of the sales methods in question."

This proposition is based on the fact that the ultimate sales to the public are made by local retail dealers, and on the thought that the petitioner can, within the four walls of its factory, so dress and pack its candies that their sale to the public will involve an unlawful practice, and can, without further concern, sell them either directly to retailers or to wholesalers and jobbers in different states who, in turn, sell them to retailers. Then, when the retailers resell the candies to the public in the way the petitioner has made possible and has intended, the commerce is intrastate, not interstate, and the petitioner is in no sense responsible for its part in the transactions.

That is wrong.

"B. The record completely fails to show a substantial and specific public interest."

Distinguished from matters of public policy, the Commission's jurisdiction concerns matters of public interest. If the methods of sale be unfair to the purchasing children, they are unfair to a part of the public, indeed to the whole of the public which purchases candy in small quantities at penny prices. If the methods of sale be unfair to competitors in the manufacture and sale of candies in the same trade, they are unfair to another part of the public. Stated crudely, there are in this case two publics, each with a different yet specific and substantial interest. To stay a wrong inflicted upon either by unfair methods of competition is clearly within the jurisdiction of the Federal Trade Commission.

"A. There is an entire absence (of evidence) of unfair methods of competition as that term is used in the Federal Trade Commission Act."

This, I think, is the heart of the case, and aside from the question of "public interest" is the only question in the case. I shall briefly discuss it, first from the standpoint of candy purchasers, and then from the standpoint of candy competitors; the two classes of the public interested and affected.

Passing by all aspects of the sale methods in question which bear upon private morals, business ethics and public policy, I shall inquire coldly into the trade or money side of the transactions. For illustration, take the "Chocolate Penny Men 120's" which are sold from a box containing 120 packages. Four have candy and a penny enclosed; 116 have candy alone. Or take the "1, 2, 3 Big Chief 60's" which are sold from a box containing 60 packages; 10 retailing for one cent each, 10 for two cents and 40 for three cents. The price is not known until the package is selected and on being broken open is revealed as one, two or three cents by a ticket enclosed. When the child makes a blind purchase of any of these candies, it pays for two things; first for the candy, and next for a chance,

that is, as the child believes, a chance of getting something for nothing. The petitioning-manufacturer, however, takes no chance; it makes certain that it is paid for this "something" by shortening the quantity or lowering the quality of the candy in the blank package, which makes up for the penny pieces in one scheme and the lower prices in the other. In this way the child, getting less candy or inferior candy, pays more for candy in Break and Take packages than for candy in competing straight packages at the same prices. In other words, the child, paying its penny, does not get a penny's worth. In this, I think, it is unfairly dealt with. It is no answer to say that the child should discriminate and buy straight goods, for, as presently will appear, the Break and Take packages have in most cases driven penny straight candies off the shelves of the shops. So the child must buy what is before it and, in doing so, is unquestionably deceived, or must go without, which with a penny in its pocket it is not likely to do.

Competition in commerce is a contest for trade. It is a fight; sometimes bitter, sometimes fatal. It is not unlawful merely because it is hard to meet or because, failing to meet it, one may be driven out of business. It is only unlawful when unfair. What constitutes unfairness varies with each case. An apposite illustration is the old trading stamp system whose conception and results were similar to those in the Break and Take packages of the petitioner. It, too, involved the delusion of getting something for nothing and has been regarded unfair and declared unlawful by the statutes of many states. There, also, two classes were affected, the purchasing public and the competing public.

Differing in a way that makes the trading stamp system look almost commendable, the petitioning candymaker in this case not only entered into competition for the penny candy trade with smaller candy units, but, stepping outside of commerce, injected into its competition a gamble which has made its competitors contest with it not only for the purchasing trade but for the speculating public. To sell their goods, its competitors have to compete with the petitioner not only in wares and prices but by devising and putting into practice more seductive .gambling schemes. This, I think, is not commerce; it is merchandising chance instead of candy. Aside from any question of morals, I regard it unfair. This view is not an abstract conception but is based on the results of the petitioner's competitive practice shown by the evidence to be as follows:

It developed that when penny and nickel "chance candies" are on sale with "straight goods," children almost universally select those involving a gamble. The result is that "straight goods" rarely sell over the same counter with "chance candies." So established is this observation that many keepers of small stores have ceased to buy and display "straight goods" for the penny trade. They sell only "chance candies." In consequence more than half of the manufacturers of penny candies in this country have gone into the trick trade. Many traveling salesmen for "straight goods" houses have complained of their inability to sell their wares in competition with "chance candies." Others have refused further to continue the effort and have threatened to seek employment elsewhere. One "straight goods" concern attributes to competition by "chance candies" a drop in its business of fifty per cent. in the sale of penny goods and twenty per cent. in the sale of nickel goods. Another concern manufacturing only "straight goods" lost some of its strong customers because, wanting "chance candies" as well, they preferred to buy both kinds at one place. Still another manufacturer who stuck to "straight goods" saw his business reduced eighty-five per cent. by reason of this new type of competition. Two other manufacturers, "competing for the child's penny," declared that their refusal thus far to put a gamble in their candy packages has placed them at a distinct disadvantage. Another concern was "forced" to meet the petitioner's competition by putting out trick candy packages. It then discontinued the practice but later was forced to resume it, mainly because of "a howl set up by our salesmen that they could not get the business." Again it stopped the practice and again it was forced to resume it in order not only to regain business in "chance candies" but to retain its business in "straight goods," as customers who still deal in candies of both kinds want to buy from one manufacturer or jobber. When it stopped selling "chance candies" its business fell off from forty to fifty per cent. When it started again, its business increased at once. Officers and salesmen of other companies testified to similar experiences, which apparently extend through the trade.

And, finally, there is evidence that candies in Break and Take packages are smaller in size, lighter in weight and inferior in quality, proving rather conclusively that children are imposed upon and that in competition with "straight goods" at the same prices the "chance" is the thing that makes the sales.

I am of opinion this evidence supports the Commission's finding of unfair competition and that that finding alone is enough to make valid the Commission's order. I think it should be sustained.