HARTZ, Circuit Judge,
concurring/dissenting.
I join Chief Judge Tacha’s thorough and scholarly opinion for the panel except for Part II.A.2, entitled “Interpretation of ‘Unfair Practices’ under § 202(a)” and Part II.A.3, entitled, “OK’s Alleged Violations of § 202(a).” I arrive at almost the same destination regarding statutory interpretation, but through a rather different route. In my view a practice may be “unfair” under § 202(a) of the Packers and Stockyards Act (PSA) even though it causes no competitive injury. In interpreting that provision we owe respect to the longstanding view of the United States Department of Agriculture (USDA), although I would reach the same interpretation even without reference to that view. On the other hand, the majority opinion’s conception of competitive injury, which I do not share, appears to be broad enough that many, perhaps all, of the practices that could properly be labeled unfair would satisfy its competitive-injury requirement. Finally, I would affirm the district court’s decision that the Growers failed to provide evidence showing that the practices challenged on appeal were unfair.
I. DEFERENCE TO THE USDA
The deference issue in this case is a very interesting one. The majority opinion appears to acknowledge that we would need to grant Chevron deference to the USDA’s interpretation of PSA § 202(a), 7 U.S.C. § 192(a), if the USDA had “authority to *1239 adjudicate alleged violations of § 202 by live poultry dealers.” Op. at 1227. See Chevron USA, Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 887, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (court should defer in certain circumstances to agency’s reasonable interpretation of ambiguous statutory language). Certainly such deference would appear to be required by the Supreme Court’s gloss on Chevron in United States v. Mead Corp., 533 U.S. 218, 226-27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001):
[A]dministrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority. Delegation of such authority may be shown in a variety of ways, as by an agency’s power to engage in adjudication or notice-and-comment rulemak-ing, or by some other indication of a comparable congressional intent.
As the majority opinion correctly notes, the USDA does not have adjudicatory authority over § 202(a) violations by live-poultry dealers. The USDA does, however, have authority to adjudicate § 202(a) violations by packers. See 7 U.S.C. § 193. Most of the judicial decisions cited by the majority opinion involved packers, see, e.g., Armour & Co. v. United States, 402 F.2d 712 (7th Cir.1968); IBP, Inc. v. Glickman, 187 F.3d 974, 977 (8th Cir.1999), so we have the peculiar situation of not granting Chevron deference to the USDA in this case but relying on cases in which Chevron deference would have been proper.
I confess to having no idea how the Supreme Court would resolve this conundrum. Perhaps it would avoid the issue as I do, by agreeing with the USDA’s interpretation. But at the least I would think that we owe respect to the experience and expertise of the USDA regarding the PSA. See Skidmore v. Swift & Co., 323 U.S. 134, 139—40, 65 S.Ct. 161, 89 L.Ed. 124 (1944). In that regard it is worth noting that 26 years ago a treatise could report that the USDA “has consistently taken the position that in order to prove that a practice violates the broad prohibitions in §§ 202(a) and (b) ... of the [PSA], it is not necessary to prove predatory intent, competitive injury, or likelihood of injury.” 1 John H. Davidson et al., Agricultural Law § 3.47, at 244 (1981). Such a longstanding view of an agency is entitled to more respect than an ad hoc litigating position. Cf. INS v. Cardoza-Fonseca, 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (“An agency interpretation of a relevant provision which conflicts with the agency’s earlier interpretation is entitled to considerably less deference than a consistently held agency view.” (internal quotation marks omitted)).
In any event, even if the USDA had never addressed the matter, I would interpret the term unfair practices as not requiring competitive injury. I am persuaded by the Supreme Court’s interpretation of the term unfair practices in the Federal Trade Commission Act (FTCA), the relationship between the PSA and that Act, and an early Supreme Court decision explaining the purpose of the PSA.
In Federal Trade Commission v. Sperry & Hutchinson Co., 405 U.S. 233, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972), the Supreme Court construed § 5(a)(6) of the FTCA, 15 U.S.C. § 45(a)(6), which stated in pertinent part:
The Commission is empowered and directed to prevent persons, partnerships, or corporations ... from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce.
*1240 (amended and now recodified as 15 U.S.C. § 45(a)(2)). The Federal Trade Commission (FTC) had held that Sperry & Hutchinson (S & H) had violated the FTCA by attempting “to suppress the operation of trading stamp exchanges and other ‘free and open’ redemption of stamps.” Sperry & Hutchinson, 405 U.S. at 234, 92 S.Ct. 898. S & H challenged the resulting cease-and-desist order, and the Fifth Circuit agreed, holding that the FTC could halt only conduct that “violated either the letter or the spirit of the antitrust laws.” Id. at 235, 92 S.Ct. 898. Before the Supreme Court the FTC did not dispute that S & H’s conduct violated neither the letter nor spirit of the antitrust laws; rather, it contended that its authority was not limited to such conduct. Id. at 239, 92 S.Ct. 898. The Court held that the FTCA “empower[s] the [FTC] to proscribe practices as unfair or deceptive in their effect upon consumers regardless of their nature or quality as competitive practices or their effect on competition.” Id.
The prior history of the Court’s interpretations of § 5(a)(6) and Sperry & Hutchinson’s comments on that history have, as we shall see, particular implications for interpreting the PSA. The original version of the FTCA, enacted in 1914, did not include the language empowering the FTC to prevent “unfair or deceptive acts or practices in commerce”; the Act provided power only to prevent “unfair methods of competition in commerce.” Federal Trade Commission Act, Pub.L. No. 63-203, § 5, 38 Stat. 717, 719 (1914) (emphasis added). In 1920 (the year before enactment of the PSA) the Supreme Court, over the dissent of Justice Bran-déis, one of the FTCA’s drafters, adopted a limiting interpretation of “unfair methods of competition,” restricting the covered practices to those “heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create monopoly.” FTC v. Gratz, 253 U.S. 421, 427, 40 S.Ct. 572, 64 L.Ed. 993 (1920); see Sperry & Hutchinson, 405 U.S. at 241, 92 S.Ct. 898. Later, in Federal Trade Commission v. Raladam Co., 283 U.S. 643, 649, 51 S.Ct. 587, 75 L.Ed. 1324 (1931), the Court made clear that an unfair method must be unfair to competitors. It said:
[T]he word ‘competition’ imports the existence of present or potential competitors, and the unfair methods must be such as injuriously affect or tend thus to affect the business of these competitors' — that is to say, the trader whose methods are assailed as unfair must have present or potential rivals in trade whose business will be, or is likely to be, lessened or otherwise injured.
Three years later, however, the Supreme Court changed course in Federal Trade Commission v. R.F. Keppel & Bro., Inc., 291 U.S. 304, 54 S.Ct. 423, 78 L.Ed. 814 (1934). As explained in Sperry & Hutchinson, 405 U.S. at 242-43, 92 S.Ct. 898, the Court in Keppel upheld an FTC cease-and-desist order against a candy marketing scheme on the ground that it “contravened public policy insofar as it tempted children to gamble and compelled those who would successfully compete with Keppel to abandon their scruples by similarly tempting children.” The marketing scheme “was ‘unfair,’ though any competitor could maintain his position simply by adopting the challenged practice.” Id. at 243, 92 S.Ct. 898. Sperry & Hutchinson concluded its summary of Keppel as follows: “Thenceforth, unfair competitive practices were not limited to those likely to have anticompetitive consequences after the manner of the antitrust law; nor were unfair practices in commerce confined to purely competitive behavior.” Id. at 244, 92 S.Ct. 898. The Court then noted that the Keppel decision’s “perspective” of the *1241 FTCA “was legislatively confirmed” in 1938 when Congress amended the Act by adding the phrase “unfair or deceptive acts or practices” to the original ban on “unfair methods of competition.” Id. at 244, 92 S.Ct. 898 (internal quotation marks omitted). The Court thought that the language unfair or deceptive acts or practices clearly did not require anticompetitive conduct. See id.
To return to the PSA, the original 1921 language of § 202(a) made it unlawful to “Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in commerce.” Pub.L. No. 67-51, § 202, 42 Stat. 161. The language “unfair ... practice ... in commerce” is the very language construed by Sperry & Hutchinson as not requiring an “effect on competition.” 405 U.S. at 239, 92 S.Ct. 898. Moreover, the language is part of the same language in the 1938 amendments to the FTCA that Sperry & Hutchinson described as “confirming]” the Keppel view that unfair practices under the FTCA were not “confined to purely competitive behavior.” Id. at 244, 92 S.Ct. 898.
Particularly noteworthy is that the language of PSA § 202(a) more clearly omits a competitive-effect requirement than does the FTCA language construed in Keppel. Section 202(a) does not include the phrase “restraining commerce” that appears in other subsections of § 202. See § 202(c) (“if such apportionment has the tendency or effect of restraining commerce”); § 202(d) (transferring or reviewing an article “for the purpose or with the effect of ... restraining commerce”); § 202(e) (doing “any act for the purpose or with the effect of ... restraining commerce”). And perhaps more striking, § 202(a) does not use the FTCA’s language “unfair methods of competition” construed in Keppel. Perhaps this failure to adopt the language of the FTCA, enacted seven years earlier, was to avoid the narrow construction of the FTCA by the Supreme Court in Gratz, decided shortly before enactment of the PSA.
Comparison of the PSA to the FTCA is sensible because the PSA is an offspring of the FTCA. In 1917 President Wilson ordered an FTC investigation of the food industry. See Davidson et al., supra, § 3.02, at 187. The FTC’s report condemned the practices of the meat-packing industry. See id. The five largest packers entered into a consent decree under the Sherman Act in 1920, but the PSA was enacted in 1921, presumably because the antitrust laws and the FTCA were deemed inadequate to the task of dealing with the problem. See id. at 187-88. In that light it would be somewhat surprising if “unfair practices” under the PSA had a narrower meaning than “unfair methods of competition” in the FTCA.
Supporting this view is the discussion of the recently enacted PSA in Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735 (1922), which upheld the PSA’s constitutionality. Some courts have relied on the Supreme Court’s statement in that opinion that “[t]he chief evil feared is the monopoly of the packers.” Id. at 514, 42 S.Ct. 397. But the purpose of the PSA was not just to end the packers’ monopoly. The 1920 consent decree should have accomplished that task. The PSA’s purpose was to end the sort of practices engaged in by the monopoly, practices that could certainly be characterized as unfair but could not easily be characterized as restricting competition. This point is made clear by quoting at length from Chief Justice Taft’s opinion for the Court:
The object to be secured by the act is the free and unburdened flow of live stock from the ranges and farms of the West and the Southwest through the great stockyards and slaughtering centers on the borders of that region, and *1242 thence in the form of meat products to the consuming cities of the country in the Middle West and East, or, still, as live stock, to the feeding places and fattening farms in the Middle West or East for further preparation for the market.
The chief evil feared is the monopoly of the packers, enabling them unduly and arbitrarily to lower prices to the shipper who sells, and unduly and arbitrarily to increase the price to the consumer, who buys. Congress thought that the power to maintain this monopoly was aided by control of the stockyards. Another evil which it sought to provide against by the act, was exorbitant charges,, duplication of commissions, deceptive practices in respect of prices, in the passage of the live stock through the stockyards, all made possible by collusion between the stockyards management and the commission men, on the one hand, and the packers and dealers on the other. Expenses incurred in the passage through the stockyards necessarily reduce the price received by the shipper, and increase the price to be paid by the consumer. If they be exorbitant or unreasonable, they are an undue burden on the commerce which the stockyards are intended to facilitate. Any unjust or deceptive practice or combination that unduly and directly enhances them is an unjust obstruction to that commerce. The shipper, whose live stock are being cared for and sold in the stockyards market is ordinarily not present at the sale, but is far away in the West. He is wholly dependent on the commission men. The packers and their agents and the dealers who are the buyers, are at the elbow of the commission men, and their relations are constant and close. The control that the packers have had in the stockyards by reason of ownership and constant use, the relation of landlord and tenant between the stockyards owner, on the one hand, and the commission men and the dealers on the other, the power of assignment of pens and other facilities by that owner to commission men and dealers, all create a situation full of opportunity and temptation to the prejudice of the absent shipper and owner in the neglect of the live stock, in the mala fides of the sale, in the exorbitant prices obtained, in the unreasonableness of the charges for services rendered.
The scope of the PSA is further reflected in the accompanying House Report, which states:
A careful study of the bill, will, I am sure, convince one that it, and existing laws, give the Secretary of Agriculture complete inquisitorial, visitorial, supervisory, and regulatory power over the packers, stockyards and all activities connected therewith; that it is a most comprehensive measure and extends farther than any previous law in the regulation of private business, in time of peace, except possibly the interstate commerce act.
H.R.Rep. No. 67-77, at 2 (1924).
It appears to me that the condemned practices described by Chief Justice Taft are of the same ilk as those that the majority opinion holds are covered by the PSA. Where I differ from the majority opinion in this regard is that I would not describe the injuries caused by those practices as competitive injuries. The majority opinion does not explain how the alleged practices hurt OK’s competitors or even how they injure competition among the Growers. The alleged injuries may be caused by the existence of a monopoly. But it is unclear to me how the practices (such as unilaterally decreasing production by delivering fewer chicks to growers) reduce competition among either growers or dealers. If competitive injury were re *1243 quired by § 202(a), I would agree with the district court that the Growers had not presented sufficient evidence of such injury.
Turning to the specific allegations of this case, I depart from the majority opinion in that I would affirm the decision below because the Growers have not presented sufficient evidence to support their claims that the practices at issue on appeal are unfair. My reasons are essentially the same as the majority opinion’s reasons for rejecting the Growers’ unconscionability claims. The Growers are not existing producers who sought a market for their product and were confronted with OK’s take-it-or-leave-it contracts. Rather, they entered into their businesses only after approaching OK and seeking approval to become its suppliers. The terms of the contract were known. The Growers made an informed decision to enter the industry. To the extent that the Growers claim that the contract misrepresents OK’s actual practice, those are deceptive-practice claims; and it is my understanding that such claims are not before us. Perhaps OK’s exercise of its authority under the contract to reduce the number of birds placed with the Growers could be an unfair practice if it were the result of an effort by OK to drive up prices for its products. But the Growers’ briefs on appeal do not allege that any reduction in placement has occurred.