# CASES

## ARGUED AND DETERMINED

### IN THE

## UNITED STATES CIRCUIT COURTS OF APPEALS
## THE CIRCUIT AND DISTRICT COURTS
## AND THE COMMERCE COURT

---

### STEERS et al. v. UNITED STATES.

#### (Circuit Court of Appeals, Sixth Circuit. December 5, 1911.)

#### No. 2,137.

**1. GRAND JURY (§ 10\*)—SELECTION OF JURORS—FEDERAL COURTS.**

In drawing a special grand jury in a federal Circuit Court in Kentucky, the clerk, for the purpose of distributing the jurors as evenly as possible between the several counties from which they were drawn, followed the method of rejecting the names of all jurors drawn who resided in a particular county after the desired number from such county had been drawn, continuing the drawing until the desired number had been drawn from each county. By Rev. St. §§ 802, 805 (U. S. Comp. St. 1901, pp. 625, 626), it is provided that jurors shall be returned from such parts of the district as the court shall direct so as to be most favorable to an impartial trial, and that special juries when ordered shall be returned in the same manner and form as is required by the laws of the state. Ky. St. § 2243 (Russell's St. § 3066), provides for the drawing of juries in the state court by the judge. *Held*, that the mode pursued by the clerk was, at most, irregular, and not prejudicial, and not such a plain error as would be noticed by the Circuit Court of Appeals in the absence of an assignment of error thereon.

[Ed. Note.—For other cases, see Grand Jury, Cent. Dig. § 27; Dec. Dig. § 10.\*]

**2. COMMERCE (§ 33\*)—WHAT CONSTITUTES "INTERSTATE COMMERCE."**

A single shipment of a commodity, as tobacco, from one state into another to be marketed, constitutes interstate trade and commerce, within the meaning of Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200).

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 33.\*

For other definitions, see Words and Phrases, vol. 4, pp. 3724–3731.]

**3. MONOPOLIES (§ 12\*)—FEDERAL ANTI-TRUST ACT—ILLEGAL RESTRAINT OF INTERSTATE TRADE.**

A direct and absolute restraint upon interstate trade and commerce bearing no reasonable relation to lawful means of accomplishing lawful ends is not relieved from criminal illegality under the Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), because the volume of traffic affected was small.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 12.\*]

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

192 F.—1

**4.** MONOPOLIES (§ 31*)—FEDERAL ANTI-TRUST ACT—CONSPIRACY IN RESTRAINT OF TRADE—INDICTMENT.

An indictment for conspiracy to restrain interstate commerce in violation of Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), considered, and held sufficient.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 31.*]

**5.** CRIMINAL LAW (§ 1043*)—TRIAL—OBJECTION TO ADMISSION OF EVIDENCE.

A general objection to the admission of evidence for which no ground is stated will not support an assignment of error in a federal court.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2654–2655; Dec. Dig. § 1043.*]

**6.** CRIMINAL LAW (§§ 673, 1038*)—TRIAL—EVIDENCE.

In a trial of a number of defendants for conspiracy, where items of evidence are necessarily admitted which at the time are competent against one defendant only, it is proper for the court to caution the jury as the trial proceeds as to the effect of such evidence, but its failure to do so, when not requested, is not reversible error.

[Ed. Note.—For other cases, see Criminal Law, Dec. Dig. §§ 673, 1038.*]

**7.** CRIMINAL LAW (§§ 315, 423*)—CRIMINAL PROSECUTION—TRIAL—EVIDENCE—STATEMENTS OF CONSPIRATOR.

A conspiracy proved to have been formed is presumed to have continued until its object was accomplished, and, on the trial of defendants charged with having conspired to prevent the shipment of certain tobacco in interstate commerce, statements made by one of defendants while the tobacco was being withheld from shipment, at their instance. were admissible against them.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 748, 989–1001; Dec. Dig. §§ 315, 423.*]

**8.** CRIMINAL LAW (§ 825*)—TRIAL—INSTRUCTIONS.

Instructions in a prosecution for conspiracy, taken together, held not erroneous, in the absence of requests for more specific instructions on certain points.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2005; Dec. Dig. § 825.*]

**9.** COURTS (§ 352*)—FEDERAL COURTS—CONFORMITY TO STATE PRACTICE—CRIMINAL CASES.

The federal conformity statute (Rev. St. § 914 [U. S. Comp. St. 1901, p. 684]), providing for conforming the procedure in the federal courts to that in the state courts in civil actions at law, does not cover instructing the jury.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 352.*

Conformity of practice in common-law actions to that of state court, see notes to O'Connell v. Reed, 5 C. C. A. 594; Nederland Life Ins. Co. v. Hall, 27 C. C. A. 392.]

**10.** CRIMINAL LAW (§ 1038*)—TRIAL—INSTRUCTIONS.

Defendants in a criminal trial in a federal court cannot assign as error the failure of the court to instruct as to certain theories or inferences, which might find support in the evidence when they did not request such instruction.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2646; Dec. Dig. § 1038.*]

**11.** MONOPOLIES (§ 31*)—ANTI-TRUST ACT—PROSECUTION FOR CONSPIRACY—SUFFICIENCY OF EVIDENCE.

Evidence considered in a prosecution for conspiracy in restraint of interstate trade and commerce in violation of the Anti-Trust Act July 2,.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

1890, c. 617, § 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), and *held* sufficient to require the submission of the case to the jury.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 31.*]

In Error to the Circuit Court of the United States for the Eastern District of Kentucky.

Criminal prosecution by the United States against John S. Steers and others. Judgment of conviction, and defendants bring error. Affirmed.

In November, 1907, W. T. Osborne, living upon a farm near Dry Ridge, Ky., and his two tenants, Stowers and Bryant, had in their possession about four hogsheads of tobacco, being their entire crop for the season of 1906. They delivered these four hogsheads to Ramsey, the railroad station agent, at Dry Ridge, and directed shipment to Cincinnati, Ohio. Ramsey gave to Osborne a bill of lading in customary form, showing that he was the shipper, and that the "Globe House, Cincinnati, Ohio," was the consignee. This was Tuesday, November 26th. It was too late for shipment that day, and the next day there was no car available; so that on Thursday the tobacco was remaining in the railroad warehouse, awaiting transportation.

An existing association among the tobacco raisers of the vicinity, called the "Society of Equity" or the "Burley Society," had pooled and was holding at its warehouses all the tobacco of its members, until such holding, with other causes, should bring about a higher price, and it was opposed to the shipment to market of any tobacco not so pooled. Osborne and his tenants did not belong to the association, and their four hogsheads of tobacco were unpooled.

During Tuesday and Wednesday, Osborne received messages to the effect that he must not ship this tobacco, and on the evening of Thursday a considerable number of men gathered in Dry Ridge with seeming reference to the matter of this shipment, and three of Osborne's acquaintances or neighbors went out to his farm to see him. They told him that there was a crowd of 50 men at Dry Ridge; that the crowd was determined this tobacco should not be shipped; and that, unless Osborne would withdraw the tobacco, it would be destroyed, and he or his property might be otherwise injured. He then determined that it might be withdrawn, and, to accomplish this result, he indorsed over the bill of lading to one of his visitors. The next morning, in seeming pursuance of some previously formed plan, a large body of men, probably 200 or 300, said to be more than had ever been seen together there before, assembled in Dry Ridge and marched to the railroad station. The indorsed bill of lading was presented, the tobacco was turned over by the station agent, and the procession, headed by four teams carrying the four hogsheads, marched away from the station, after the crowd had called the agent outside and notified him that he must not ship any unpooled tobacco. The four hogsheads were then returned to Osborne's premises and kept there by him until January 14, 1908. On this last day one of those who had been active in the proceeding notified Osborne that he was at liberty to ship the tobacco, and he did so at once.

A special grand jury considered these acts to be in violation of the congressional act, approved July 2, 1890, commonly called the "Sherman Anti-Trust Law," and returned an indictment against the appellants and four others. Motions to quash and demurrers were overruled, and the respondents tried upon their pleas of not guilty. The case was nolle prossed as to one respondent, the jury acquitted three, and the appellants, eight in number, were convicted and severally sentenced to pay considerable fines. They all join in this writ, and assign a large number of errors. While we have not omitted to consider each one argued, we must confine this opinion to the few which seem to us most deserving of discussion.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

W. W. Dickerson (Clore, Dickerson & Clayton and Myers & Howard, on the brief), for plaintiffs in error.

. E. P. Grosvenor, Sp. Asst. Atty. Gen. (James A. Fowler, Asst. Atty. Gen., and Edwin P. Morrow, U. S. Atty., on the brief), for the United States.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above).  [1] 1. Upon their motion to quash the indictment, respondents offered to show that, proceeding under an order for the drawing of a special grand jury, the clerk, acting as jury commissioner, drew names in the ordinary way from the box used for that purpose, when the court was sitting at London, and containing the names of jurors residing in the counties from which juries were customarily drawn for service at that point.   However, he did not take, as jurors, the first 28 names drawn; . but, following a plan to apportion the jury approximately evenly numerically between the various counties (as, for example, to procure five jurors from each of four counties and four from each of two counties), after the drawing had given him the predetermined number of names from one county, he rejected further names from that county, and continued the drawing until he had procured such number from each county.   This method of selection is said not to be in compliance with sections 800, 802, 805, 915, R. S. (U. S. Comp. St. 1901, pp. 623, 625, 626, 684), and section 2243, Ky. St. (Russell's St. § 3066).   No error was assigned upon this point, but it was pressed upon us on the argument.

We must presume regularity in all cases where the contrary is not expressly shown, and we think the proper inference from this record is that the counties, or the part of the district, to which the drawing was confined, had been designated by the order of the court referred to or were selected with the knowledge and approval of the judge. Whether we should also infer from this record that the apportionment which the clerk made among the several counties was pursuant to an order of the court or an established practice approved by the court, or whether we should infer that the clerk's action was without any sanction of the court, we think immaterial to the disposition of this case.   In the former event, there would be no irregularity.   In the latter case, it is enough to say that the method adopted by the clerk would have been the natural and reasonable method for the court to adopt, had it given instructions on the subject.   It did not result in any grand jurors from an unauthorized district or any incompetent grand jurors; and, if irregular at all, the overruling of a motion to quash, based thereon, would not be such a plain error, as, under rule 11 (150 Fed. xxvii, 79 C. C. A. xxvii), we ought to notice in the absence of any assignment.

[2] 2. Demurrer.   The first ground of demurrer was that one shipment by one shipper to another state does not amount to that interstate trade, the restraint of which is forbidden.   This argument is

based upon the cases holding that a single transaction does not amount to trade or business under the rules governing levying a tax upon a business or engaging in business in a state; upon the holding in Packet Co. v. Bay, 200 U. S. 179, 26 Sup. Ct. 208, 50 L. Ed. 428, that an insignificant interference with interstate commerce may, under this act, be disregarded; and upon the supposed holding in the recent Standard Oil and Tobacco Cases, 221 U. S. 1, 106, 31 Sup. Ct. 502, 632, 55 L. Ed. 619, 663, to the effect that, in order to be covered by this statute, the restraint of trade must be of considerable quantity; that is, of unreasonable amount.

"Trade," as referring to a business which must have a fixed continuance and established character in order to be in existence so as to be subject to a tax or so as to be carried on within a state, cannot be synonymous with "trade" in the sense of commerce or traffic or transportation from one place to another; and so decisions like Cooper Mfg. Co. v. Ferguson, 113 U. S. 727, 734, 5 Sup. Ct. 739, 28 L. Ed. 1137, are not relevant.

In the Packet Company Case, the interference under consideration, aside from that dependent on the sale of the vendor's good will, was indirect, contingent, and uncertain. The court did not say that the amount of traffic was too insignificant to require action, but that this uncertain, remote, and contingent interference was insignificant. In the present case the interference was absolute and entire. All of the traffic or commerce involved was wholly stopped.

We do not find in the Standard Oil and Tobacco Cases any holding that a direct restraint of trade must affect an unreasonably great amount of commerce in order to be within the prohibition. As we read these opinions, the matter under consideration, from the standpoint of reason, was not the amount of merchandise or traffic affected by the restriction, but the character and extent of the restriction itself; and it was thought that, if such restriction reasonably pertained to lawful results, it was not of itself necessarily forbidden. These opinions contain no justification for the idea that a direct and absolute restraint, bearing no reasonable relation to lawful means of accomplishing lawful ends, can be permitted only because the volume of traffic affected is not very great.

[3] It is true that the theory of injury to the public lies at the bottom of the statute, and that it is directed against things which tend "to deprive the public of the advantages which flow from free competition" (Northern Securities Case, 193 U. S. 197, 332, 24 Sup. Ct. 436, 454 [48 L. Ed. 679]); but a single, private injury may well tend to this public result.

We cannot doubt that there may be a conspiracy under the act with reference to a single shipment only, and that, in so far as the rule of insignificance may exist, it does not apply to circumstances like these. This shipment was the entire crop of these three farmers for the year. It was, to them, of large relative value. It cannot be overlooked as unimportant; and its shipment to Ohio did constitute "interstate trade and commerce." It was clearly interstate transportation; and interstate transportation is interstate commerce. U. S. v.

Freight Ass'n, 166 U. S. 290, 312, 17 Sup. Ct. 540, 41 L. Ed. 1007; Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488.

[4] The next ground of demurrer was that the indictment did not show the facts constituting the conspiracy, but only alleged the conclusion. If this statement were accurate, the indictm ∶ would not be good; but we do not think such construction is justified by the indictment. This alleges that appellants "did conspire together and engage in a conspiracy among themselves in restraint of said interstate commerce so carried on by said Osborne and said railway company * * * by the several means now here set forth and described: that is to say." It then describes, as the "means" adopted, constituting the conspiracy, a plan to assemble a mob and by threats, intimidation and violence, compel Osborne to withdraw the shipment, or if he would not, then to compel the railroad agent to turn it over to the conspirators. The indictment then proceeded under the heading "overt acts," to describe the things which were done by defendants, being the same things which it had already recited as planned. It is said that the description of overt acts cannot be carried over into the accusatory portion of an indictment, nor make it good when that accusatory portion fails from the lack of stated facts, and this seems to be the applicable rule of pleading. U. S. v. Britton, 108 U. S. 199, 205, 2 Sup. Ct. 531, 27 L. Ed. 698. Here, however, the specific statement of the several means which were determined upon as a part of the plan should be treated as in the accusatory portion, and, when so treated, the indictment is not open to the objection that it states conclusions only.

The next ground of demurrer is that the indictment did not sufficiently allege that the accused, at the time of their conspiracy, or while acting thereunder, knew that the tobacco was an article of interstate commerce. A conspiracy of this general character is a crime at common law, and presumably was in Kentucky, and we are not clear that it is necessary to allege scienter as to the specific fact which makes the crime cognizable in one court instead of in another; but, however that may be, we think the guilty knowledge is sufficiently alleged. The indictment alleges that the tobacco in fact entered upon its interstate shipment; that then the defendants unlawfully did knowingly conspire together and engage in a conspiracy among themselves, in restraint of said interstate trade and commerce so carried on by said Osborne and said railroad company; that one means of such conspiracy participated in by defendants was to frighten Ramsey for the purpose of preventing him from shipping this tobacco to Cincinnati, to which point it had been consigned; that another means was to compel Osborne to remove this tobacco, consigned as aforesaid; that another means was by taking the tobacco by force from the railroad, and thereby, to prevent the transportation of said tobacco from Dry Ridge, Ky., to Cincinnati, Ohio; that then they were to use every means in their power to prevent Osborne from shipping said tobacco from Kentucky to Ohio. We cannot doubt that the defendants were by these allegations fairly charged with knowing at the time that their conspiracy was directed against to-

bacco which was in the course of shipment out of the state; and whether they were fairly so charged is the test of sufficiency. Foster v. U. S., 178 Fed. 165, 171, 172, 101 C. C. A. 485, and cases cited.

The indictment is further attacked because so many different, contemplated means of accomplishing the conspiracy are alleged, and it is said that this makes the indictment vague and uncertain. It is not open to this objection. The allegations of the various means in contemplation are not of simultaneous and inconsistent plans, but plans for successive action, one step of which should be taken if previous steps failed. Complaint as to such an indictment would come with better force from the government which might have been embarrassed by so specific an allegation of all the plans involved.

[5] 3. Admission of Evidence. To the evidence offered many objections were made and overruled, and on these rulings error is now assigned. In most instances the objection was without any stated ground. It was only, "We object." Error cannot be well assigned on such a record. Foster v. U. S., 178 Fed. 165, 176, 177, 101 C. C. A. 485. However, we prefer to consider the merits of those objections which seem more important.

[6] The government was allowed, in many instances, to show statements or conduct by one respondent in promoting or executing the conspiracy, but not in the presence of or with the knowledge of other respondents. The others would have been entitled to an instruction that such evidence should be considered only as against the one until the jury was otherwise satisfied that the conspiracy existed, and that the others were parties. They did not ask such instruction, nor do we find from record of the trial or the charge that such instruction was given in that precise form, although such rule was substantially stated in the general charge. We think it proper during the progress of a conspiracy trial, and when of necessity items of evidence are being received which, at the time, are competent against only one defendant, to caution the jury as to the lawful effect of such evidence; and to do so frequently enough so that the trial court may be sure the jury understands the distinctions which should be made. Indeed, a direct instruction to the jury on this subject, at an early stage of the trial, may often be advisable; but it does not follow that judgment of conviction should be reversed because the record does not show that the court of its own motion gave such caution. The judge may know from what has been said in argument by counsel before the jury, or in casual discussion not taken down by the reporter, or from the jurors' experience in previous trials, that they do understand the proper effect of such evidence. Certainly we will not presume prejudice from the court's failure to make a distinction of this kind, in a case where he was not asked so to do.

[7] Mrs. Osborne was permitted to testify to a conversation with the respondent Webb, January 14, 1908. Mrs. Osborne says:

"He told me my husband could now ship his tobacco off; that they had concluded to let it go. He says, we are going to let it go now, that others are shipping."

This is objected to because it is said there is no evidence that the conspiracy was still existing, and because the statements of one conspirator, after the object of the conspiracy is accomplished, are not receivable against the others. The rule is clear enough, but not its application. The fair import of this conspiracy was not merely to remove the tobacco from interstate commerce on November 28th, but to keep it removed. A conspiracy is a continuing offense, until its object is fully accomplished, and we see no reason to doubt from this record that whatever conspiracy there was continued until January 14th. There is no evidence that it had ceased.

[8] 4. The Charge to the Jury. The case for the government was made by the testimony of 14 witnesses, some of whom were cross-examined at length. The respondents introduced one witness, who testified to their good character, and then rested. The case was then argued to the jury by the counsel for the government and by three counsel for the respondents. The court then charged the jury, and, in the course of such charge, made a general review or summing up of the evidence, expressing, in many cases, his view of its force. At the conclusion of such summary, he repeated, in differing forms, that the issues were for the jury to decide according to its conviction, and said:

"It is true, as counsel has stated, that you are the triers of these facts. It is for you to determine them."

After the charge had been finished and exceptions taken, he additionally instructed the jury:

"Gentlemen of the jury, a word or two about what I said with reference to what took place in regard to this tobacco. I have said that certain facts are shown by the evidence, or used the expression 'the evidence shows.' What I meant to say was that the testimony of the witnesses was to the facts as stated. You are the judges of the credibility of the witnesses and the weight to be attached to their testimony, and of the facts shown by their testimony. I have aimed to state all the facts and circumstances testified to in this case. If I have omitted any, you will bear them in mind, and give them such weight as they are entitled to."

In the course of his summary of evidence, the court said:

"There is no room for question that it was known by the parties who may be guilty as charged here that it was intended for shipment to Cincinnati, Ohio."

The evidence, if credible, did show beyond question that each of the respondents was present at the taking of these hogsheads at the station, loading them into the wagons and carrying them away, and that each hogshead was prominently marked with its destination.

Referring to the good character evidence, the court said:

"This is all the evidence that has been introduced before you favoring the defendants."

And, speaking generally of the government's evidence, further said:

"That evidence, so far as it goes, has not been contradicted by any witness. There is no conflict in the evidence. * * * There is no conflict whatever in the evidence here, save in so far as the showing by these wit-

nesses may be antagonized by the presumption of innocence, and the fact that these defendants are in good standing."

Elsewhere the jury was fully instructed as to the rule of presumption of innocence and of reasonable doubt. Counsel argue that these instructions were wrong, because the cross-examination of the government's witnesses furnished evidence for respondents and raised conflicts in the evidence, and because such instructions foreclosed the credibility of the government's witnesses.

With reference to these two recited comments on the evidence, we think that in connection with the other instructions and cautions to the jury they were not beyond the proper limits of that discretion which judges of federal courts have in this particular. Simmons v. U. S., 142 U. S. 148, 155, 12 Sup. Ct. 171, 35 L. Ed. 968.

Referring to the visit at Osborne's house Thursday evening by Webb, Carter, and Conrad, and to what they said to Osborne, the court said:

"Under the evidence, and there is no room for difference of opinion as to the matter, that was a threat to Osborne that, if he did not assign over the bill of lading, his tobacco would be destroyed. It was under that threat that he assigned and turned over his bill of lading."

It was the theory of these three respondents that they had learned of the plan to take the tobacco away from the railroad, and perhaps destroy it, but had no part in such plan, and that they went to Osborne merely as a friendly act to warn him of the existence of the danger, and to advise with him as to whether it would not be wiser for him to yield his position. Under the evidence, there is no room for difference of opinion that Osborne received from these visitors a threat. There is room for difference of opinion whether the threat was by them as to what they would do or what would be done with their approval, or whether they were merely conveying to Osborne information that a threat was being made by others. If their visit to him and their whole connection with the entire transaction were of this latter character only, they were not guilty under the indictment, and they were entitled to have from the court a specific instruction of this character; but if any of the associates, in a conspiracy like this, were really attempting to accomplish its object, it would be very natural for them to accompany their visit to Osborne with protests of their personal friendship and their personal efforts to protect him, and these protestations in this case, made under such circumstances, were merely evidence to be considered by the jury in connection with everything else done by these three men in determining the real character of their actions. The case was of that class where adverse inferences of a broad and general, and perhaps a natural, character, may be drawn against respondents from the conceded facts, but where, under a specific theory of their application, those facts may be consistent with innocence. Respondents did not request any such specific instructions. It is not to be supposed that respondents' counsel failed to argue to the jury, with the same force with which they have argued the same point in this court, that, if these three defendants did not in fact participate in the conspiracy but only carried a friend-

ly warning, they were not guilty. Then the jury was instructed that what these respondents said to Osborne was a threat—an instruction which, as we have seen, was broadly correct, but did not completely differentiate. The jury was further instructed that it could not convict any one respondent until it was satisfied that he had participated in the conspiracy, and that the question whether each one did so participate was a question of fact for the jury. Under all of the conditions attending this charge, we will not presume any prejudice to these three respondents from the lack of a specific instruction on this theory.

[9] Respondents' counsel urge in this court that under the Kentucky procedure it is the duty of the trial judge to give to the jury "the whole law," and that respondents, in a criminal case, carry no such burden as we, by these conclusions, put upon them. This is a matter pertaining to the conducting of the trial itself by the trial judge, and it is not governed by the conformity act. R. S. § 914 (U. S. Comp. St. 1901, p. 684); Knight v. Ill. Centr. R. Co. (C. C. A. 6th Circuit) 180 Fed. 368, 372, 103 C. C. A. 514.

[10] No such rule, to the broad extent to which counsel now claim for it, exists in the federal courts. True, the trial judge should instruct the jury as to the whole law in one sense of that phrase, but if there are particular theories of fact or constructions of evidence which, if adopted, would take the respondents out of otherwise proper, general inferences, or if the counsel thought that the jury should have particular instructions as to the effect of certain evidence upon an individual defendant, or with reference to other matters of like character, respondents cannot complain of an omission of such instruction by the court, if they did not bring such matters to his specific attention by appropriate request. The trial judge, in the trial of an indictment for conspiracy against several respondents and where the evidence is circumstantial, has burden enough in properly conducting the trial, if he receives from counsel on both sides all the aid which they can give to prevent the overlooking of details.

[11] 5. Instructed Verdict. Each of the respondents moved for an instructed verdict of acquittal, and each now insists that there was against him no evidence justifying submission. We do not take this view of the record. If the evidence was credible, the existence of a conspiracy to prevent this shipment was perfectly clear. It was also undisputed that each of these respondents was present in the crowd on Friday morning when the object of the conspiracy was accomplished by taking the tobacco away and when notice was given to the railroad agent that he must not accept any more such tobacco for shipment. In this general action all the respondents were apparently joining, and the participation of several of them in the conspiracy is indicated by other evidence relating to other times. While it would have been within the province of the jury, upon this record, to acquit any or all of the respondents, it is not easy to understand their purpose in their actions Friday morning and their other established conduct, unless they were intending to co-operate in stopping the shipment of this tobacco or any more like it. It is not necessary to find

that any respondent desired personal injury to Osborne or destruction of his property. Very likely they hoped to avoid these results; but the offense might be complete without either of these elements.

The record does not indicate to us any miscarriage of justice, and the several respective judgments of conviction and sentences will be affirmed.