STANDARD OIL CO. v. FEDERAL TRADE COMMISSION. GULF REFINING CO. v. SAME. MALONEY OIL & MFG. CO. v. SAME.*

(Circuit Court of Appeals, Third Circuit. July 14, 1922.)

Nos. 2599, 2609, 2632.

1. **Trade-marks and trade-names and unfair competition ⬤80½, New, vol. 8A Key-No. Series—Practice of loaning equipment to retailers held to affect public, so as to authorize proceedings under Trade Commission Act.**

If the practice of wholesale dealers in gasoline in loaning or leasing without rental to many thousands of retailers, throughout a territory comprising more than half the population of the United States, equipment for the storage, measurement, and delivery of gasoline, on their agreement to use it exclusively for the storage and handling of gasoline purchased from the wholesaler, is illegal, it so affects the public as to authorize proceedings under Federal Trade Commission Act, § 5 (Comp. St. § 8836e), providing for a proceeding when it shall appear to the commission that such a proceeding would be to the interest of the public.

2. **Trade-marks and trade-names and unfair competition ⬤80½, New, vol. 8A Key-No. Series—Loaning of gasoline storage equipment to retailers for use only in storing lender's gasoline held not unfair competition.**

The loan or lease without rental by wholesalers to retailers of equipment for the storage, measurement, and delivery of gasoline on the retailer's agreement to use it solely for gasoline purchased from the lender, but without any agreement not to purchase gasoline from others, does not constitute unfair competition under Trade Commission Act, § 5 (Comp. St. § 8836e), and Clayton Act, § 3 (Comp. St. § 8835c), as to the public, other wholesalers, retailers, or manufacturers of such equipment.

3. **Monopolies ⬤10—Scope of Clayton Act defined.**

The Clayton Act seeks to reach monopolies in their incipiency and stop their growth, but is not intended to reach every remote lessening of competition, or every dim or uncertain tendency to monopoly, or any possible lessening of competition, or possible creation of monopoly, but only acts which probably lessen competition substantially and actually tend to create a monopoly.

4. **Monopolies ⬤12(2)—Lease of machinery on agreement not to handle competitor's goods to be considered by its effect as well as by its terms.**

Under Clayton Act, § 3 (Comp. St. § 8835c), declaring it unlawful to lease machinery, etc., on the agreement or understanding that the lessee shall not use or deal in the goods, etc., of competitors of the lessor, where the effect may be to substantially lessen competition or tend to create a

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari granted 258 U. S. —, 43 Sup. Ct. 97, 67 L. Ed. —.

282 F.—6

monopoly, such a tying contract is to be construed, not by its terms alone, but by its effect as well.

Morris, District Judge, dissenting in part.

Petitions for Review from Federal Trade Commission.

Original petitions by the Standard Oil Company, by the Gulf Refining Company, and by the Maloney Oil & Manufacturing Company to set aside orders of the Federal Trade Commission. Orders set aside, and complaints dismissed.

James H. Hayes and Chester O. Swain, both of New York City, for Standard Oil Co.

W. J. Guthrie, of Pittsburgh, Pa., for Gulf Refining Co.

Herbert B. Fuller, of Cleveland, Ohio, for Maloney Oil & Mfg. Co.

E. W. Burr and Adrien F. Busick, both of Washington, D. C., for Federal Trade Commission.

Before WOOLLEY and DAVIS, Circuit Judges, and MORRIS, District Judge.

WOOLLEY, Circuit Judge. In these proceedings we are asked to review and set aside three orders of the Federal Trade Commission commanding the petitioning corporations forever to cease and desist from a practice found by the Commission to violate section 5 of the Act creating the Federal Trade Commission (38 Stat. 717, 719 [Comp. St. § 8836e]) and section 3 of the Clayton Act (38 Stat. 730, 731 [Comp. St. § 8835c]). The applicable provisions of these statutes are:

In the first, "That unfair methods of competition in commerce are * * * unlawful," and, in the second, "That it shall be unlawful for any person engaged in commerce * * * to lease * * * or make a sale * * * of goods, * * * machinery, * * * or other commodities * * * on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, * * * machinery, * * * or other commodities of *, * * competitors of the lessor or seller, where the effect of such lease [or] sale, * * * or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

These are three of a large number of cases involving the same practice. They were tried in three groups. The testimony in one group bore most directly on gasoline marketing in states along the Atlantic seaboard. In another it related particularly to business done by companies within the State of Ohio. In the third it concerned business farther west. As the testimony in all cases was in the main identical, the twelve comprising the eastern group (which includes the cases at bar) were combined and heard together.

The testimony discloses a practice which has been widely pursued in the eastern part of the United States by corporations refining and marketing gasoline. It consists of what is practically a loan, or technically a lease without rental, by a wholesaler to a retailer, of equipment for the temporary storage, measurement and delivery of gasoline to the consuming public. The practice extends mainly to the

retailer whose place of business is referred to as a "curb filling station." The leased equipment is known as a "curb pump outfit" and comprises a sunken tank for the storage of gasoline and a pump of familiar design by which gasoline is drawn from the tank and delivered to motor vehicles. The retailer is the proprietor of the station and is generally engaged in some other business. Typical of his class are keepers of country stores, residents in hamlets and at cross-roads, and farmers. The practice does not relate to retail stations owned and managed by the refining and marketing companies themselves. These are the more elaborate affairs also familiar to the public and generally known as "service stations." Proprietors of garages comprise an intermediate class of retailers to whom the practice in some measure extends.

The practice held by the Commission to offend against the statutes is found wholly within the terms of the leasing contracts. The form of the contract is important in two respects: First, in what the wholesaler requires the retailer to do; and, second, in what it does not require him to do. The form of contract used by the Standard Oil Company is identical in substance with contracts used by the other petitioners. Paraphrased, it is as follows:

Reciting by preamble that the retailer is now purchasing gasoline from the wholesaler for sale to its customers and has requested it to install on his premises equipment for the better storage and handling of the gasoline so purchased, and that in compliance with his request the wholesaler is about to make the installation, it is agreed between them that the "equipment shall be used solely for the storage and handling of motor gasoline purchased by the" retailer from the wholesaler. Then follow undertakings by the retailer that he will maintain the equipment in good condition at his own cost; that he will not encumber or remove it or permit it to be seized or taken in execution; and that he will indemnify the wholesaler from liability for injuries occasioned by leakage, fire, or explosion of gasoline. The contract concludes with four provisions for its termination: First, upon the use of the equipment by the retailer for any other purpose than the storage and handling of gasoline purchased from the wholesaler; second, upon the retailer's failure for thirty days to purchase gasoline from the wholesaler; third, upon the sale of the premises by the retailer; and, fourth, by either party upon five days' notice in writing to the other party, with the right of the wholesaler in any event to enter upon the premises and remove the equipment.

Having stated what the contract requires the retailer to do, the things which it does not require of him are equally important. The first is he is not required to pay any license fee, rental or other thing for the use of the equipment; nor is he restricted in his business to the equipment covered by the contract. On the contrary, he may use other equipment leased by competing wholesalers, or purchased by himself. Nor does the contract expressly tie him to the wholesaler's products. He may freely deal in gasoline or other petroleum products purchased from competing wholesalers. He may not,

however, use the equipment of the contract for storing and handling a competitor's gasoline.

In justification of their practice the petitioners maintain that the curb pump outfit is a natural development of the oil industry. In this industry the distribution and marketing of petroleum products more or less volatile and therefore more or less dangerous has always been a serious problem. The petitioners point out that for many years kerosene and other less volatile oils have been sold to retailers in barrels or direct to householders in cans. The barrels and cans being the property of the wholesaler are returned when the contents are removed. When the market for gasoline and more volatile oils developed, the wholesaler for safety shipped them to the retailer in steel barrels or drums. These also remained the property of the wholesaler and were returned when empty. With the marvelous increase of motor vehicles in all sections, urban and rural, there came a corresponding necessity for wider distribution of gasoline. Distribution from large central reservoirs to distant places by barrels and drums was no longer practicable. Then curb filling stations were established and curb pump outfits were installed whereby gasoline is delivered by tank trucks to many smaller centers and there stored and sold. These centers grew in number as the demand spread. At first this demand was met by one station and one outfit. As the demand increased stations and outfits were multiplied, the purpose of the practice, the petitioners claim, being to increase business by making easy and convenient the sale of gasoline to the public everywhere. But outfits cost money and the little storekeeper and the farmer by the roadside could not be induced, and frequently were not able, to invest capital in the purchase of an outfit. The result was that outfits were purchased by the wholesaler and loaned or leased to the retailer at practically no cost to him, yet upon the terms with respect to their use which we have detailed.

The view which the Federal Trade Commission takes of this practice is quite different. Its conclusions based on its findings of fact are that the installation of one outfit either supplies the needs of the retailer or meets the demand of his locality, and that, in consequence, the retailer has neither economic means nor personal desire to permit the installation of more than one outfit on his premises; that the contract for an outfit has the effect of tying the retailer to the products of the one wholesaler so long as one outfit meets the local demand and of substantially lessening competition by enabling the wholesaler to monopolize first one retailer and then, as the contracts are multiplied, to monopolize many thousand retailers, and eventually the whole territory in which they reside. Finding this practice of the petitioners violative of the laws referred to, the Commission entered the orders to cease and desist here under review.

On this statement of facts we shall discuss the practice as it bears on four classes of interested parties. The first of these is the public.

[1] The Federal Trade Commission Act, in so far as proceedings thereunder are founded on a public interest, provides:

" * * * If it shall appear to the commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect. * * *." 38 Stat. 719, § 5 (Comp. St. § 8836e).

See F. T. C. v. Gratz, 253 U. S. 421, 40 Sup. Ct. 572, 64 L. Ed. 993.

The petitioners challenge the authority of the Federal Trade Commission to institute and prosecute these proceedings on two grounds as affecting the public interest. The first is, that the complaints do not allege facts necessary to show that public interest is involved. Upon taking this position there arose an issue whether public interest is a matter to be found by the Federal Trade Commission preliminary to the issuance of its complaints, or is a fact to be alleged in the complaints and proved like any other fact. This question in view of the record, is purely academic, because whether public interest is to be regarded as a consideration moving the Commission to action or a jurisdictional fact to be pleaded and proved in support of its action, the fact of public interest in these cases is abundantly established.

The law of unfair competition in its modern conception regards as its chief concern the effect of forbidden acts upon consumers. The Congress in passing the Clayton Act and denouncing tying contracts and leases obviously had in mind the public as the principal sufferer therefrom. It is true, as said by Judge Denison in Steers v. United States, 192 Fed. 1, 112 C. C. A. 423, in speaking of the Sherman Anti-Trust Act (26 Stat. 209 [Comp. St. §§ 8820–8823, 8827–8830]), that the theory of injury to the public lies at the bottom of the statutes and is directed against things which tend to deprive the public of the advantages which flow from free competition. Having denounced methods of business which are unfair and which substantially lessen competition and tend to create a monopoly, it is clear that in a case of this kind the public is within the protection of these statutes. If under these statutes the practice is illegal, then in truth the public which pays the bill is the main sufferer. As the practice extends to many thousand retailers and comprehends many million transactions through territory comprising more than half of the population of the United States, it is idle to say that the public has not an interest. Therefore, on this contention we think the petitioners have wholly failed to grasp the principle and purpose of the statutes and are entirely wrong in their contention.

[2] The next contention of the petitioners, however, is very different. It squarely meets the issue of public interest and is to the effect that the evidence fails to show that the public has been injured. With this we agree. Postponing discussion of the effect of the practice upon competition and monopoly, we do not find that the practice has increased the cost of distribution or has enhanced the price of gasoline to the public. On the contrary it has decreased the cost of distribution. Whether the price to the public has been reduced, we cannot say. Clearly the public has found an advantage in the practice both in the matter of convenience and in the certainty of getting the precise

make of gasoline advertised on the globe of the pump. On the other hand, if the orders of the Commission commanding the petitioners to cease and desist from the practice and thereafter to lease outfits to retailers only on remunerative rentals stand, the inevitable result will be that the number of curb filling stations will be reduced, thereby lessening the convenience to the public; or the rental charged the retailer for the outfit will be covered by fixing wholesale prices so as to allow him a larger profit. In the readjustment, the public doubtless will undergo its usual experience of paying higher prices.

The second class of parties interested in or affected by the practice is that of oil refiners or wholesalers, including both the petitioning wholesalers—the leading actors in the practice—and their wholesale competitors. The parts played by the members of this class depend for their legality upon the scope and purpose of the two statutes involved.

The first paragraph of each of the orders of the Commission does not deal with the restrictive clause of the contract; it deals solely with the leasing of outfits for a nominal rental or for no rental at all. One question decided by the Commission and here under review is whether this feature of the contract is an unfair method of competition within section 5 of the Federal Trade Commission-Act. Interpreting this section, the Supreme Court, in Federal Trade Commission v. Gratz, 253 U. S. 421, 427, 40 Sup. Ct. 572, 575 (64 L. Ed. 993), said:

"The words 'unfair method of competition' are not defined by the statute and their exact meaning is in dispute. It is for the courts, not the commission, ultimately to determine as matter of law what they include. They are clearly inapplicable to practices never heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create monopoly. The act was certainly not intended to fetter free and fair competition as commonly understood and practiced by honorable opponents in trade."

[3] Therefore in determining, as matter of law, whether leasing of gasoline outfits without rentals is an unfair method of competition, we shall inquire whether the method is characterized by oppression of competitors or is against public policy because of its dangerous tendency unduly to hinder competition or create monopoly. So also under the Clayton Act, by force of which the Commission framed the second paragraph of each of its orders denouncing the restrictive clause of the contract, we shall, upon the authorities given below, make a similar inquiry with reference to the effect of the practice in lessening competition and creating a monopoly. To make clear the principle upon which we shall examine the testimony and decide these cases, it may be well to observe that the Clayton Act, which is a part of the scheme of laws against unlawful restraints and monopolies, does not wait for its operation until monopolies have been created and restraints of trade established, but seeks to reach them in their incipiency and stop their growth. Yet, in thus avoiding an objectionable effect by removing the cause, the Congress did not intend the statute to reach every remote lessening of competition or every dim and uncertain tendency to monopoly. It intended rather that the

Commission, and ultimately the courts, should inquire not whether a given practice may possibly lessen competition or possibly create a monopoly, but whether it probably lessens competition—and lessens it substantially—and whether it actually tends to create a monopoly. Standard Fashion Co. v. Magrane-Houston Co., 258 U. S. ——, 42 Sup. Ct. 360, 66 L. Ed. ——. Though differing somewhat from other laws, as we have indicated, the Clayton Act, nevertheless, deals with matters within the realm of monopoly. Therefore in determining whether given acts amount to unfair methods of competition within the meaning of the Federal Trade Commission Act, or substantially lessen competition and tend to create a monopoly within the meaning of the Clayton Act, the only standard of legality with which we are acquainted is the standard established by the Sherman Act in the words "restraint of trade or commerce" and "monopolize, or attempt to monopolize," and by the courts in construing the Sherman Act with reference to acts "which operate to the prejudice of the public interest by unduly restricting competition or unduly obstructing the due course of trade," and "restrict the common liberty to engage therein." Great Atlantic & Pacific Tea Co. v. Cream of Wheat Co. (D. C.) 224 Fed. 566, 573, affirmed 227 Fed. 46, 141 C. C. A. 594; United States v. American Tobacco Co., 221 U. S. 106, 179, 31 Sup. Ct. 632, 55 L. Ed. 663; United States v. Patten, 226 U. S. 525, 541, 33 Sup. Ct. 141, 57 L. Ed. 333, 44 L. R. A. (N. S.) 325; Eastern States Lumber Asso. v. United States, 234 U. S. 600, 613, 614, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788; Standard Oil Case, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; Standard Fashion Co. v. Magrane-Houston Co., 258 U. S. ——, 42 Sup. Ct. 360, 66 L. Ed. ——.

Applying this standard to the trade practice here involved, the first question, that of unfair method of competition, relates to the leasing of outfits without rentals.

Is this phase of the practice oppressive upon competitors and does it tend to create a monopoly? Concededly, a lease of a curb pump outfit without rental gives a wholesaler a trade advantage over its competitors. This alone is not unlawful, for such advantage is the object of all competition and is attained whenever one sells another goods of greater excellence or at lower prices than goods offered by others. Does this trade advantage contain the seeds of monopoly? It admittedly leaves competitors free to install competing outfits in the same locality and in all other localities. It also leaves every competitor free to place its outfit with the same retailer if it can prevail upon him by the ordinary competitive inducements of better goods, lower prices, and easier terms of credit. That the practice imposes upon a competitor the investment of more capital is an argument which would apply with equal force—and with equal infirmity—to competition based on superiority of goods and liberality of credit.

Under the Federal Trade Commission Act declaring unfair methods of competition unlawful—as the Act stood before the passage of the Clayton Act—a loan of a curb pump outfit without return or a lease without rental did not, we think, tend to create a monopoly, and,

accordingly, was not, in our opinion, an unfair method of competition.

[4] But the Clayton Act, when it came along, bore upon another phase of the contract, namely, upon the clause which restricts the use of the leased outfit to the product of the wholesaler, thereby, the Commission found, lessening competition and tending to create a monopoly. Such a clause of a contract, commonly known as a tying contract, is to be construed not by its terms alone but by its effect as well. The Act looks particularly to the consequences. In the United Shoe Machinery Corporation Case, 258 U. S. ——, 42 Sup. Ct. 363, 66 L. Ed. ——, the Supreme Court said: .

"While the clauses enjoined do not contain specific agreements not to use the machinery of the competitor of the lessor, the practical effect of these drastic provisions is to prevent such use. We can entertain no doubt that such provisions as were enjoined are embraced in the broad terms of the Clayton Act which cover all conditions, agreements, or understandings of this nature. That such restrictive and tying agreements must necessarily lessen competition and tend to monopoly is, we believe, equally apparent. * * * This system of 'tying' restrictions is quite as effective as express covenants could be, and practically compels the use of the machine of the lessor, except upon risks which manufacturers will not willingly incur."

The point of similarity between the United Shoe Machinery Corporation Case and the cases at bar is that, in both, the offending clauses did not expressly provide against the use of machinery or equipment of competitors. The difference between the contract clauses in the two cases is that as certain machinery of the United Shoe Machinery Corporation was essential to the lessee in his business, the practical effect of the clauses in that contract, although not specifically prohibiting the use of the machinery of a competitor, was absolutely to prevent its use; while the clause of the contract in the cases under consideration related to but one kind of machine or equipment, and extended to a situation which did not impose upon the lessee the necessity of obtaining something from the lessor which was indispensable in his business, the clause in consequence, did not have the practical effect of preventing the use of equipment of a competitor.

Also, the cases at bar are distinguished from the Standard Fashion Co. v. Magrane-Houston Co., 258 U. S. ——, 42 Sup. Ct. 360, 66 L. Ed. ——, by the fact that the contract in that case contained an express agreement that the retailer should not sell or permit to be sold on his premises any other make of patterns. Here was a restrictive covenant which by its terms came within the third section of the Clayton Act. In discussing this clause the Supreme Court approved an observation in the opinion of the Circuit Court of Appeals, as follows:

"The restriction of each merchant to one pattern manufacturer must in hundreds, perhaps in thousands, of small communities amount to giving such single pattern manufacturer a monopoly of the business in such community. Even in the larger cities, to limit to a single patternmaker the pattern business of dealers most resorted to by customers whose purchases tend to give fashions their vogue, may tend to facilitate further combinations; so that the plaintiff, or some other aggressive concern, instead of controlling two-fifths, will shortly have almost, if not quite, all the pattern business." '

It has been suggested that this expression is apposite to the leasing contract here under discussion. But we think the cases are distin-

guished by the important fact that there the dealer was restricted by the contract to the sale of patterns of one manufacturer. This eliminated from his business all other patterns and tied him to the patterns of the contract. Here he is restricted in the use of the leased outfit to the storage and delivery of gasoline purchased from the lessor, but he is not limited to the use of one outfit, nor is he hampered in the sale of gasoline and other products of other manufacturers. The contract leaves every competitor free to persuade the retailer to install an additional outfit or to replace the outfit already installed by one of its own; and permits the retailer to 'yield if he chooses. While the effect of the restrictive clause of the contract in these cases may make competition somewhat more difficult because of the inclination of a satisfied retailer to stand by his wholesaler until another comes along and offers him something better, we are of opinion that the clause does not thereby lessen competition between wholesalers to the extent contemplated by the statute and that a tendency to monopolize the wholesale trade has not been disclosed. "That it was not intended to reach every remote lessening of competition is shown in the requirement that such lessening must be substantial." Standard Fashion Co. v. Magrane-Houston Co., 258 U. S. ——, 42 Sup. Ct. 360, 66 L. Ed. ——; Standard Oil Co. v. F. T. C. (C. C. A.) 273 Fed. 478, 17 A. L. R. 389; Canfield Oil Co. v. F. T. C. (C. C. A.) 274 Fed. 571; Sinclair Refining Co. v. F. T. C. (C. C. A.) 276 Fed. 686.

The third class of parties interested in the practice is that of retailers.

Many retailers buy and own curb pump outfits. With these we have nothing to do except to note that by the practice of leasing outfits competition with them is greatly increased. We are concerned only with the retailer who has not money enough to purchase an outfit, or, having money, does not care to risk it. What happens? If his locality promises trade, one of the many wholesalers will supply him with an outfit without cost and without risk to him. The only condition imposed is that he shall not store and deliver through the outfit gasoline of any other wholesaler. The tying element in the transaction, if any there be, is the one arising from human nature and business sense, namely; that the retailer will install no other outfit so long as he is satisfied with the quality and price of the wholesaler's gasoline and so long as one outfit serves his trade. The contract leaves him perfectly free to deal in all petroleum products made by competing wholesalers. He is at liberty to install, by lease or purchase, as many other outfits as he may choose and to sell through them as many brands of gasoline as he may desire. The leasing contract, being terminable by him at will on brief notice, permits him to change outfits at will, replacing one by another as often in the course of wholesalers' competition as he is induced to do so. The retailer, regarded in the aggregate, is an actor in the practice, who by reason of his number, place and interest causes competition between wholesalers to be increased rather than lessened. If the practice is abridged or abolished the retailer's risk is increased and his number diminished, and, correspondingly, competition is lessened. Certainly the retailer's part

in the practice violates neither of the statutes. Nor, for the reasons given, can we think he is monopolized by the wholesaler, or the territory in which many retailers do business under the practice is monopolized.

The fourth class of parties claiming an interest in the practice is that of manufacturers of curb pump outfits. Of these there are a half dozen or more in the country, in none of which the petitioning corporations have an interest. The petitioning corporations do not manufacture pump outfits themselves but purchase them from manufacturers like anyone else. The 'Commission found as a fact that having purchased outfits, the petitioning corporations then leased them in competition with manufacturers engaged in the sale of like equipment in commerce, and upon this finding drew the conclusion:

"That the practice of leasing such devices at a nominal rental * * * is an unfair method of competition in interstate commerce as against the competitors of respondents engaged in the manufacture of such devices, and in the sale of the same for profit, in the territory wherein the respondent leases such devices. * * * "

After the manufacturer has sold equipments to the respondents without condition or limitation, and has turned them loose in commerce, we are at a loss to see just how he can be heard to complain that the equipment so sold and paid for is being leased by the owners on terms which make it difficult for him to sell like equipments to others. As there is involved here no question of fraud, deception, good conscience, or even business ethics, we should hesitate to follow business transactions to this length and determine whether conduct so remotely related to the original transaction of purchase is an unfair method of competition.

Having given these cases full and deliberate consideration, we are of opinion that, while the evidence supports some of the Commission's findings of fact as distinguished from the conclusions drawn from them,—it does not establish the offences laid in the complaints and founded on the statutes, and, accordingly, does not sustain the orders based thereon. Therefore, we are constrained to set aside the orders and direct that the complaints be dismissed.

MORRIS, District Judge (concurring in part and dissenting in part). The operative parts of the order of the Commission here attacked are that the respondent forever cease and desist from:

"1. * * * Leasing pumps or tanks or both and equipment for storing or handling petroleum products in furtherance of its petroleum business, at a rental which will not yield to it a reasonable profit on the cost of same after making due allowance for depreciation. * * *

"2. Entering into contracts or agreements with dealers in its petroleum products or from continuing to operate under any contract or agreement already entered into whereby such dealers agree or have an understanding that as a consideration for the leasing to them of such pumps and tanks and their equipment, the same shall be used only for storing or handling the products of respondent. * * * "

The first paragraph of the order is directed only to the method of competition whereby the petitioners lease pumps and tanks to retail-

ers at a nominal rental and is concerned not at all with the restrictive or tying clause of the lease. Divorced from the tying clause, leasing the pumps at a nominal rental is, in my opinion, a practice "never heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud, or oppression," nor is that practice against public policy as declared by the Sherman and Clayton Acts, and, consequently, is not an unfair method of competition within section 5 of the Trade Commission Act, as interpreted by the Supreme Court in Federal Trade Commission v. Gratz, 253 U. S. 421, 427, 40 Sup. Ct. 572, 64 L. Ed. 993, even though the leasing of the pumps at a nominal rental may, perhaps, have a tendency to lessen competition either in the sale of pumps or in the sale of gasoline at wholesale. I am therefore in full accord with the views expressed by the majority of the court with respect to the first paragraph of the Commission's order.

The second paragraph of the order rests upon section 3 of the Clayton Act. While section 5 of the Trade Commission Act provides, "If it shall appear to the commission that a proceeding by it * * * would be to the interest of the public, it shall issue," etc., no similar provision is found in the Clayton Act. In proceedings under that act public interest is as conclusively presumed as in a criminal proceeding, and needs to be neither alleged nor proved. Consequently, as I see it, the petition for review presents with respect to the second paragraph of the order two questions only: First, whether the leases here involved are "on the condition, agreement, or understanding that the lessee * * * shall not use or deal in the goods, * * * merchandise, * * * or other commodities of a competitor of the lessor"; and, if so, then, second, whether "the effect of such lease, * * * condition, agreement, or understanding may be to substantially lessen competition or tend to create monopoly in any line of commerce," both within the meaning of section 3 of the Clayton Act. The leases contain the following provision:

"That the said equipment shall be used solely for the storage and handling of motor gasoline purchased by the party of the second part from the party of the first part for the purpose aforesaid."

While the foregoing clause does not contain a specific agreement not to use or deal in the gasoline of a competitor of the lessor, yet the clause falls within the terms of the Clayton Act, if its practical effect is to prevent such use. United Shoe Machinery Corp'n et al. v. United States, 258 U. S. ——, 42 Sup. Ct. 363, 66 L. Ed. —— (decided April 17, 1922). Whether the practical effect of the restrictive agreement is to prevent the lessee from using or dealing in the gasoline of a competitor must be determined from the findings of the Commission and the evidence adduced before it, for under section 11 of the Clayton Act (Comp. St. § 8835j) its findings of fact are conclusive, if supported by the testimony. One of the findings of the Commission, supported by the testimony, is:

"That a small number of retail dealers to whom the respondent leases or sells such devices upon the terms and conditions aforesaid, handle similar products of respondent's competitors, but a large majority of the retailers to

whom the respondent leases or sells such devices upon the terms and conditions aforesaid, require and use in their business only a single pump outfit."

With respect to the one-pump retailer the restrictive clause in the leases in question is as effective in preventing the lessee from using or dealing in the gasoline of a competitor of the lessor as if the lease expressly so provided. True, the lessee may terminate the lease at the time and under the conditions mentioned therein, but that fact does not enable the tying clause to elude the prohibition of section 3 of the Clayton Act, for that section operates with respect to short term leases and leases at will in like manner and with like force as it does with respect to long-term leases, or, for that matter, leases in perpetuity. The legality or illegality of the tying clause is dependent not at all upon the duration of the lease or the manner in which it may be terminated. It is likewise true that the lessee has the right to install another pump of his own or a pump of a competitor; but, as his business does not warrant or require more than one pump, he has not installed more than one, and, consequently, his right is not a practical one, but a mere abstract right. The result in my opinion is that in practice the restrictive clause of the leases in question has prevented and prevents a "single pump" lessee from using or dealing in gasoline of a competitor of the lessor just as effectively as if the lease had expressly so provided. Consequently the lease falls within the prohibition of section 3 of the Clayton Act, if the effect of such lease "may be to substantially lessen competition or tend to create a monopoly" in selling gasoline at wholesale.

Whether its effect may be to substantially lessen competition or tend to create a monopoly is our second question for consideration. The leases are now in force. The fact that they may be terminated at some future time is not relevant to the issue now under consideration. What has already been said shows that "a large majority of the retailers" require for use in their business only a single pump outfit, and the practical effect of the restrictive covenant of the lease under which they operate is to prevent such large majority from using or dealing in the gasoline of competitors of their respective lessors. Thereby free competition among the wholesalers of gasoline has been and now is restricted, not with respect to an insignificant number of retailers, but with respect to a large majority thereof, and as effectually as if the leases were in perpetuity and as if they expressly prohibited the lessee from using or dealing in the gasoline of the competitors of the respective lessors.

The petitioners have set up as a reason for the reversal of the Commission's order the excellence of the pump as a means for storing and delivering gasoline. But the Commission has not attacked the pump. On the contrary, it admits the pump's many advantages and great utility. It denies, however, the right of the petitioners to make unlawful contracts with respect thereto, or otherwise to use it as a means of stifling competition. The petitioners further urge that the restrictive clause is the only method by which they are enabled to use and adequately protect their trade-mark. Even if this contention were

supported by the evidence, it would be ineffective, for the petitioners are not at liberty to violate the law of the land, whatever proper result may be the consequence of their so doing. The evidence, however, discloses that many pumps are owned by retailers, yet there is no evidence that the name of the gasoline being sold through such pumps is not exhibited in the same manner as it is on the leased pumps. Nor is there any evidence that in such cases the gasoline of one wholesaler has been sold as the gasoline of another. These last contentions of the petitioners are, in my judgment, wholly irrelevant to either of the two issues presented with respect to section 3 of the Clayton Act.

Again, the petitioners contend that by means of the leases in question the number of retailers has been substantially enlarged, and competition thereby increased rather than lessened. If it be a fact that by means of the leases the number of retailers has been increased, such increase was beyond question due to the nominal rental and not to the tying clause, and the tying clause is none the less invalid, even though accompanied by other clauses that are valid. Furthermore, each increase obtained by the nominal rental was simultaneously monopolized by the tying clause, and competition thereby lessened and not increased.

Although not differing from the majority of the court as to the legal principles by which the correctness of the second paragraph of the Commission's order should be tested, yet I find myself not in full accord with their ultimate decision, for the only conclusion that I am able to reach by applying those principles of law to the facts of these cases is that the effect of the restrictive covenant has been, now is, and so "may be," to substantially lessen competition; that the practical effect of that covenant is to prevent the "one-pump" retailer from using or dealing in the gasoline of a competitor of his lessor; and that, consequently, all "one-pump" leases are in violation of section 3 of the Clayton Act, and invalid.